**John Albert BURKS, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 70971.

Court of Criminal Appeals of Texas, En Banc.

March 9, 1994.

Kenneth L. Ables, Hoagie L. Karels, Waco, for appellant.

John W. Segrest, Dist. Atty., and Ralph T. Strother and Crawford Long, Asst. Dist. Attys., Waco, Robert Huttash, State's Atty., Austin, for State.

## OPINION

WHITE, Judge.

Appellant was convicted of the offense of murder committed in the course of a robbery. See TEX.PENAL CODE ANN. § 19.-03(a)(2). In accordance with the jury's affirmative answers to the special issues, his punishment was assessed at death. See TEX. CODE CRIM.PROC.ANN. Art. 37.071(b)(1) and (2). Direct appeal to this Court was automatic. Id., § (h). We will affirm.

In twenty-eight points of error, appellant argues: the evidence was, absent the testimony of the accomplice witness' testimony, insufficient to "tend to connect" appellant to the instant offense; the trial court erred when it overruled his motion to quash the indictment, and his motion to change venue; the trial court erred when it excused from jury service those persons who were over the age of 65, and those persons who were unable to read and write; the trial court erred when it overruled nine of his challenges for cause; the trial court erred in admitting statements made by the victim and another witness which gave a description of the perpetrator, in admitting evidence that appellant asked for bullets 7 to 10 days prior to the instant offense, in admitting evidence of appellant soliciting help in a robbery one month prior to the instant offense, in admitting evidence of a conversation between ap-

pellant and his accomplices overheard on the day before the instant offense, and in admitting into evidence statements made by the victim to his wife and daughter; statements made by the State during the examination of the treating doctor were so prejudicial and inflammatory as to render futile an instruction to disregard; the trial court erred in admitting evidence of appellant's arrest as evidence of flight; the trial court erred when it denied appellant the right to admit evidence that another person admitted to the commission of the instant offense; the State's final argument at guilt-innocence was so inflammatory and prejudicial as to render futile an instruction to disregard; the trial court erred at punishment when it admitted evidence of a prior alleged capital murder; the trial court should have given an instruction at punishment on mitigating circumstances; the trial court should have defined the phrase "criminal act of violence" in the charge at punishment; the trial court erred in not instructing the jury at punishment on the evidence of extraneous offenses and how to consider them; and, lastly, the trial court erred when it failed to define the term "continuing threat to society" in the charge at punishment, which precluded the jury from giving consideration to mitigating evidence. As appellant contests the sufficiency of the evidence to convict him in his fourteenth point of error, a detailed discussion of the facts is necessary to fully address appellant's claim of insufficient evidence.

## STATEMENT OF FACTS

### A.   Non-accomplice evidence

According to Victor Macias, at approximately 11:00 a.m. on Friday, January 20, 1989, Macias drove to Jesse's Tortilla Factory located on Webster Street in Waco to cash a check. He observed a short Black man carrying a black object in his hand and "trot-

ting" towards a green late sixties model car parked on the side of the road near Jesse's Tortilla Factory.[1] The man got into the backseat of the green car. When Macias arrived at Jesse's Tortilla Factory, he saw Jesse Contreras, the store owner, running towards the side of the building and he also saw blood on the pavement leading to the front door of the building. No one was inside the store; but there was blood on the floor. Macias went back outside where he saw the green car speeding away. Macias testified that he saw the driver and another man seated in the backseat, but did not see anyone else in the car.[2] When Macias went back inside the building, he saw Contreras calling his daughter on the telephone. Macias stayed until she arrived.

Gloria Contreras Diaz testified that when she arrived at the store, her mother was tending her father who was spitting up blood and appeared to be in pain. Diaz testified that her father told them a Black man with a mask had attempted to steal his money, but he threw a trash can at the perpetrator who then shot him. Contreras died twenty-seven days later as a result of multiple gunshot wounds.

A firearms expert testified that two .25 caliber bullets removed from Contreras' body were fired from the same gun, probably a .25 caliber semi-automatic Raven Arms pistol—a compact pistol easily carried in a pocket without notice or discomfort and sometimes referred to as a "Saturday Night Special." Four other spent bullets found at the crime scene, admitted in evidence, while not identifiable as having been fired from the same gun as the other two, were .25 caliber. Also found at the crime scene were five spent .25 caliber shell casings. The shell casings were manufactured by three different manufacturers which could mean they were obtained from different sources. The number of bullets contained in a .25 caliber semi-automatic Raven Arms pistol is six.

---

1. At trial, Macias identified the car depicted in State's exhibits two through five as the same car he saw parked on the side of the road. Two other State's witnesses identified the car depicted in State's Exhibits two through five as belonging to Mark McConnell, an accomplice.

2. There is no evidence in the record that Macias ever viewed a lineup and he was not asked at trial whether appellant was one of the men he saw in the car as it sped away.

Appellant's half-brother, Louis McConnell, testified that two weeks before the instant offense appellant asked him whether he owned a gun or knew someone who did; Louis responded negatively. Louis McConnell lived with his father, Bishop McConnell, Jr., and his brother, Bishop McConnell III. The following week, Louis came home from work around 5 p.m. and saw a small caliber pistol and a dark navy or black stocking cap on a table. Appellant, Bishop McConnell III, Carlton Johnson and Victor Monroe were at the house. Louis McConnell testified that he saw appellant pick up the gun and walk toward the door. Even though Louis McConnell saw appellant leave with the stocking cap, he did not see appellant leave with the gun. After appellant left, Louis McConnell noticed the gun was no longer in his house.[3]

Johnny Cruz, a local grocer, testified that one week before the offense, appellant approached him seeking .25 caliber bullets for an automatic handgun. After the shooting, Cruz saw Mark McConnell driving a late sixties model green Chevrolet Impala.

Appellant's cousin, Ike Weeks, testified that in late December appellant asked him to participate in a robbery, but he refused. The day before the offense, Weeks saw appellant, Mark McConnell and Aaron Bilton standing in an alley. Weeks overheard appellant tell Mark that he would call him the next day at 9:00 a.m. so that Mark could pick

him up, and that Mark would receive a $10.00 bag of marihuana and some money. Weeks further testified that sometime in January, but before the offense, appellant asked him whether he had any bullets.[4]

Vincent Guillem, a mechanic, testified that he was in his yard between 10:00 a.m. and 10:30 a.m. on the morning of the offense when Mark McConnell drove up in his green Chevrolet.[5] Guillem saw four people in the car—Bishop McConnell III, Mark McConnell, appellant, and another person. Appellant got out of the car and asked Guillem whether he had any .25 caliber bullets. When he said no, appellant walked across the street to his house and returned to Mark's car. Guillem stated that appellant left with Mark McConnell driving the car. Mark McConnell was the only person Guillem said left with appellant. Guillem did not mention the accomplice, Bilton, or Bishop McConnell being with appellant. Sometime later Guillem heard ambulance sirens, and ten to fifteen minutes after the sirens, he saw Mark's car drive by very fast.

Appellant's aunt testified that a few days after the offense she accused appellant of having been seen at Jesse's Tortilla Factory when Contreras was shot. Appellant denied this, claiming that no one had been there when he left, and he threatened her when she said that she would notify the police if she found out that he had shot Contreras.[6]

While separately talking to Contreras and Macias, Detective Price of the Waco Police

3. Louis McConnell also stated that he thought he saw Bishop McConnell III pick up the gun, but he "wasn't for sure. He (Bishop) said he thought about picking it up but he didn't."

4. Weeks testified that appellant either asked for .25 caliber bullets or .32 caliber bullets.

5. Guillem identified Mark McConnell's car as the same car depicted in State's exhibits two through five.

6. Upon direct examination by the State, appellant's aunt testified as follows:

> Q. [Prosecutor]: Now tell me what you said in response to his [appellant's] statement.

A. [Appellant's aunt]: Well, I said, "Well, you probably will do like you did before and leave a witness."

\* \* \* \* \* \*

Q. What were you referring to when you said "before"?
A. Well, I had heard—
Q. Okay. Don't tell me—Okay. Let me ask you this. Don't tell me what you had heard, okay? Let me ask you this. When you said, "you'll probably leave a witness like you did before," were you thinking of the shooting of Jesse Contreras?
A. Yes, I was.
Q. Now after you made that statement, what did [appellant] say back to you?
A. He said I didn't know what the hell I was talking about.
Q. Is that his exact words or did he say something different?

Department obtained a description of the suspect as being a Black male possessing a black ski mask, small build, 5'6" to 5'7". Price ascertained during separate conversations with Macias and Guillem that the vehicle involved was a green four-door mid to late sixties model Chevrolet with a specific license plate number. Four days after the offense Price observed Mark McConnell driving a car matching that description, which Price later identified at trial as the same car depicted in State's exhibits two through five.

In February, 1989, Detective Price notified the police in Harlingen that a warrant had been issued for appellant's arrest in connection with this offense.[7] During the first week of March, 1989, two Harlingen police officers in a patrol car noticed appellant walking on a sidewalk in the west part of town and drove up behind him. When Detective Davilla called appellant's name and identified himself as police, appellant ran. Davilla chased him on foot, but then lost him.

> A. No, he said, "You don't know what the hell you're talking about."
> Q. Okay. What did you then say?
> A. I knew that they had been using Mark's car and Mark's car was seen over at Jesse's place.
>
>    *    *    *    *    *    *
>
> Q. Okay. After you said that tell the Jury what this Defendant said to you.
> A. Well, first he said I didn't know what the hell I was talking about, and I told him, I said, "you probably will leave a witness like you did before." About that time we was arguing and my brother come in.
> Q. Okay. Go ahead.
> A. And asked me to leave. He said, "You better come and get her because I'm going to knock her fucking head off."
> Q. Okay. Let me ask you this. Before you got to that, I believe you indicated that he said to you, "you don't know what you're talking about." And you said something to him about you had heard that Mark's car was involved in Jesse's shooting and that he was driving Mark's car that day, right?
> A. Yes.
> Q. Did he say something to you about having been to Jesse's?
> A. He said there wasn't no—
> Q. You can say it.

Detective Saldivar observed appellant hiding in someone's garage. When appellant saw Saldivar, he began running again. Saldivar chased him on foot to a fenced enclosure where she drew her weapon and told him to stop as he attempted to climb over the fence. Davilla arrived shortly thereafter, and appellant was taken into custody.

### B. Accomplice-witness testimony

According to Aaron Bilton, sometime in January, but before the offense, appellant told him that he needed money and on the day before the offense, appellant told him that he was going to "knock off Jesse." Appellant wanted Bilton to go inside Jesse's Tortilla Factory first to see who was there. Appellant had planned the offense for noon the next day, but because Bilton had to be at work at 11:00 a.m., appellant agreed to do it earlier. Appellant had planned the offense for the next day, which was Friday, because

> A. Wasn't 'nary dick over there when I left.
>
>    *    *   ·*    *    *    *
>
> Q. Have you heard [appellant] use the word "dick" before?
> A. Yeah, he uses slang words.
> Q. Okay. When you've heard him use the word—by having him use the word "dick" have you learned what is meant by that word?
> A. Yes.
> Q. What does [appellant] mean by the word "dick"?
> A. A man.
> Q. After this statement, that is "there wasn't 'nary a dick around there when I left," what if anything did you say to this Defendant about what you would do if you found out for sure that he did it?
> A. I said if I know for sure that you was the one that shot Jesse, I'd drop a quarter on you.
> Q. What do you mean by the word or phrase "drop a quarter"?
> A. Call the law.
> Q. When you told [appellant] that if you found out for sure that he shot Jesse, you'd drop a quarter, tell this Jury what he said to you.
> A. That's when he said he was going to knock my fucking head off.

**7.** The record reflects that appellant sometimes resided in Harlingen.

he knew Contreras cashed checks on Friday.[8] Bilton testified that appellant had already discussed the matter with Mark McConnell and that Mark was to receive $100 for his participation. On the morning of the offense, appellant and Mark arrived at Bilton's home in Mark's car between 10:15 a.m. and 10:30 a.m.. Bilton identified Mark McConnell's car as the green four-door Chevrolet depicted in State's exhibits two through five. The three men proceeded to Bilton's uncle's house. On the way, appellant stated that he was going to "knock off Jesse today." When they arrived, Bilton went into his uncle's house and watched television while Mark drove Bilton's aunt downtown. Appellant did not go with Mark nor did he go inside the house. When Mark returned five minutes later, the three men drove to Jesse's Tortilla Factory in Mark's car.

Once there, Bilton entered the store and attempted to purchase some corn tortillas, but Contreras said that they did not have any. Bilton returned to the car and told appellant that they did not have corn tortillas and that Contreras was the only one inside. Appellant told him to go back and purchase some flour tortillas and make certain that Contreras was alone. Bilton purchased the flour tortillas and reassured appellant that Contreras was alone. Appellant told Mark to let him out and then drive around to Twelfth Street and park. Wearing a blue or black stocking cap, appellant got out of the car. About five minutes later, appellant "trotted" towards the car holding his stocking cap in his hands. Bilton testified that the stocking cap appeared to have something in it.[9] Appellant laid down in the backseat, stated that he didn't get anything and told

Mark to drive off. Bilton testified that after they dropped him off at work that morning, he did not see appellant again until after Bilton's arrest for the offense.[10]

## SUFFICIENCY OF NON–ACCOMPLICE TESTIMONY

In his fourteenth point of error, appellant contends that absent the testimony of Aaron Bilton, the accomplice-witness, the evidence is insufficient to support appellant's conviction.

Article 38.14 of the Code of Criminal Procedure provides:

[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX.CODE CRIM.PROC.ANN. Art. 38.14. The test for sufficient corroboration is to eliminate from consideration the accomplice testimony and then examine the other inculpatory evidence to ascertain whether the remaining evidence tends to connect the defendant with the offense. *Cockrum v. State*, 758 S.W.2d 577, 581 (Tex.Cr.App.1988), cert. denied, 489 U.S. 1072, 109 S.Ct. 1358, 103 L.Ed.2d 825 (1989); *Granger v. State*, 683 S.W.2d 387, 392 (Tex.Cr.App.1984) (quoting *Edwards v. State*, 427 S.W.2d 629, 632 (Tex. Cr.App.1968)), cert. denied, 472 U.S. 1012, 105 S.Ct. 2713, 86 L.Ed.2d 728 (1985).

One hour before the offense, Guillem saw appellant with Mark McConnell in Mark's car. Shortly after the shooting, Ma-

---

**8.** Diaz, Contreras' daughter, testified that on Fridays her father usually did not make tortillas until after the lunch rush hour because he cashed checks on Fridays and he did not want to handle the food when he cashed checks.

**9.** Bilton also testified that he did not hear any gunshots and did not know that Contreras had been shot until he watched the local news that evening. This is consistent with the testimony of the firearms examiner that a .25 caliber semiautomatic pistol does not make much noise when fired. Bilton further testified that he never saw

appellant with a gun on the day of the offense, although sometime before the robbery, he had seen appellant with a gun at Bilton's uncle's house.

**10.** Bilton was charged with capital murder for his participation in the offense, but the McLennan County District Attorney's office agreed to dismiss the charges in exchange for his testimony in this case.

cias saw a short Black man carrying a black object run from the store and climb into a car similar, if not identical, to Mark's car.[11] Although appellant lived near the crime scene,[12] testimony that appellant was seen in close proximity to the crime scene shortly before the crime occurred in a vehicle similar to the vehicle observed at the crime scene tends to connect appellant with the offense. *Cockrum*, 758 S.W.2d at 581; *Granger*, 683 S.W.2d at 393.

Louis McConnell testified he saw appellant with a gun similar to the one used in the instant offense about one week before the crime. The murder weapon in the instant offense was a .25 caliber pistol. Proof that appellant was seen with a gun similar to the murder weapon is proper corroborating evidence. *Cockrum*, 758 S.W.2d at 582; *Granger*, 683 S.W.2d at 393.

The record also reflects that appellant approached at least three different people during the weeks before the offense, up until one hour before the offense, seeking .25 caliber bullets. Because the two bullets extracted from the deceased's body were .25 caliber, this also tends to connect appellant to the offense. *See Granger*, 683 S.W.2d at 393.

Appellant's aunt testified that appellant made incriminating statements in a discussion they had a few days after the offense. When his aunt accused him of having been seen at Jesse's Tortilla Factory when Contreras was shot, appellant stated that no one had been there when he left, and he threatened her when she said that she would notify the police if she found out that he had shot Contreras. Further, appellant fled when approached by police officers one and one-half months after the offense. Evidence of flight and guilty demeanor, coupled with other corroborating circumstances, may tend to connect a defendant with the crime. *Gosch v. State*, 829 S.W.2d 775, 782 (Tex.Cr.App.1991).

■ The non-accomplice evidence does not have to directly link appellant to the crime, nor does it alone have to establish appellant's guilt beyond a reasonable doubt; rather, the non-accomplice evidence merely has to tend to connect appellant to the offense. *Reed v. State*, 744 S.W.2d 112, 126 (Tex.Cr.App.1988) (citations omitted); *Granger*, 683 S.W.2d at 392. The combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses in this case satisfies the proper test for corroboration. *Reed*, 744 S.W.2d at 126. When considered jointly, the testimony of the non-accomplice witnesses is sufficient to tend to connect appellant with the commission of the crime. The non-accomplice evidence showed that (1) appellant was near the scene of the crime only one hour before the offense in the same type vehicle later seen at the crime scene, (2) appellant had a weapon similar to the murder weapon shortly before the offense, (3) immediately prior to the offense appellant was looking for the same caliber bullets as the bullets removed from the deceased, (4) appellant had an incriminating conversation with his aunt, and (5) appellant attempted to evade police after the offense. When all of these factors are taken together, they sufficiently tend to connect appellant to the offense. Appellant's fourteenth point of error is overruled.

In his first point of error, appellant complains the "trial court erred in overruling the defendant's motion to quash the indictment for the failure to allege the victim of the alleged robbery or attempted robbery." In the indictment, the State alleged that appellant:

"did then and there intentionally cause the death of an individual, JESSE CONTRERAS, by shooting him in the chest with a deadly weapon, to-wit: a firearm, and the said JOHN ALBERT BURKS was then

---

11. Although testimony received at trial shows that appellant is a Black man, no testimony was given as to appellant's height or build.

12. Guillem was working on a car at 705 South 10th Street, which is two blocks south and three blocks east of Jesse's Tortilla Factory. Appel-

lant's and Mark McConnell's residences are also located in the 700 block of South 10th Street. When they approached Guillem for bullets, they were closer to their own homes than to the crime scene.

and there in the course of committing and attempting to commit the offense of robbery,"

Appellant filed a motion to quash the indictment because of the State's failure to allege the name of the victim of the underlying robbery which raised the murder to capital murder. Appellant argues this failure denied him adequate notice of the charges against him and denied him the right to claim prior jeopardy or double jeopardy in a subsequent prosecution.

■ In regards to any potential claim of jeopardy which appellant might have to assert in a future prosecution, the proper time to argue this issue is after he has been charged or indicted for that unnamed future offense. As of now, that issue is far from ripe. It is not properly before this Court in the instant appeal.

In support of his claim of lack of notice, appellant relies upon this Court's decision in *King v. State*, 594 S.W.2d 425 (Tex.Cr.App. 1980). In *King*, this Court stated, "the name of the person at whom the aggravating conduct is directed is ... a fact which is crucial to the accused's preparation of his defense to the main charge of capital murder." This Court found the defendant in *King* was entitled to allegations sufficient, both to give him accurate notice of the charges against him, and to give him precise notice of the offense with which he has been charged. However, we do not believe that *King v. State* controls disposition of this point of error because the indictment in *King* is distinguishable from the instant indictment.

■ The indictment in the instant case was not susceptible of an interpretation that the victim of the underlying robbery was a person other than the named victim of the murder. In *Pinkerton v. State*, 660 S.W.2d 58, at 63 (Tex.Cr.App.1983), this Court found that *King* was not controlling because the indictment in *Pinkerton* was not open to an interpretation "that the intended victim of the intended rape was anyone other than the deceased." *Pinkerton v. State, Id.* The rule

of *King* applies only when the "criminal conduct constituting the aggravating feature of the offense may be directed at a person other than the ultimate victim of the capital murder." It is in that situation that the failure to allege the victim of the underlying felony becomes a fact crucial to an accused's preparation of a defense. *Tompkins v. State*, 774 S.W.2d 195, at 207 (Tex.Cr.App.1987); and *DeVaughn v. State*, 749 S.W.2d 62, at 70 (Tex.Cr.App.1988). In the instant case, the victim of the capital murder was also the victim of the underlying felony.

■ Even if the failure to allege the name of the victim of the underlying robbery in the instant case was a fact crucial to appellant's preparation of his defense, a reviewing court would next have to determine "whether, in the context of the particular case, this failure had an impact on the accused's ability to prepare a defense, and, how great an impact." *DeVaughn v. State*, 749 S.W.2d, at 70. See, also, *Adams v. State*, 707 S.W.2d 900, at 902–904 (Tex.Cr.App.1986); *Flowers v. State*, 815 S.W.2d 724, at 729 (Tex.Cr.App.1991); and *Rougeau v. State*, 738 S.W.2d 651, at 656 (Tex.Cr.App.1987), cert. denied, 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988).

In the instant case, the State argued in its brief on appeal that during the trial, it informed appellant that it intended to prove that the victim of the underlying robbery was the same person named as the victim of the murder. On April 28, 1989, 67 days before the trial began, during a pre-trial hearing on appellant's motion to quash, the attorney for the State said:

"We will tell the Court and defense counsel that the victim of the robbery was also Jesse Contreras."

Appellant had ample notice that the victim of the underlying robbery was the same person alleged to be the victim of the murder. The failure of the State to allege the name of the robbery victim did not adversely impact on appellant's ability to prepare his defense. *DeVaughn v. State*, 749 S.W.2d, at 70; *Adams v. State*, 707 S.W.2d, at 902–904; *Flowers v. State*, 815 S.W.2d, at 729; and

*Rougeau v. State*, 738 S.W.2d, at 656; and see, also, *Hillin v. State*, 808 S.W.2d 486, fn. 3, at 488–489 (Tex.Cr.App.1991). We believe the instant indictment is not flawed by the absence of the name of the victim of the underlying robbery. Point of error one is overruled.

■ In his second point of error, appellant argues the "trial court erred in overruling the motion to change venue filed by defendant in that the controverting affidavit did not comply with Rule 602, Texas Rules of Criminal Evidence." At trial, appellant objected to the State's controverting affidavit on the ground that the affiant, Joe Johnson, did not have personal knowledge of the information contained therein, citing TEX. R.CRIM.EVID. Rule 602 for the trial court.[13] Appellant cites no authority to support his argument that a controverting affidavit, filed pursuant to TEX.CODE CRIM.PROC.ANN. Art. 31.04 [14], must comply with Rule 602.

■ The purpose of the controverting affidavit is to provide a form of pleading which establishes that there is a factual dispute in need of resolution. *Roy v. State*, 608 S.W.2d 645, at 648 (Tex.Cr.App.1980). There is no requirement that the controverting affidavit comply, on its face, with Rule 602. A controverting affidavit, pursuant to Art. 31.04, is a notarized statement of the opinion of the compurgator that the opposing affiant is not credible, and/or that opposing affiant's means of knowledge are not sufficient. A controverting affidavit is not a witness' sworn statement of fact as to a matter at trial, as contemplated by Rule 602. If the compurgator takes the stand at the venue hearing to testify, his testimony would fall under the proscriptions of R. 602.

We find that the controverting affidavit in the instant case is identical in wording to that found in the State's controverting affidavits in *DeBlanc v. State*, 799 S.W.2d 701, at 704 (Tex.Cr.App.1990), cert. denied, — U.S. ——, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991); and *Cockrum v. State*, 758 S.W.2d 577 (Tex.Cr.App.1988), cert. denied, 489 U.S. 1072, 109 S.Ct. 1358, 103 L.Ed.2d 825 (1989). We find the State's controverting affidavit in the instant case was sufficient to create a factual dispute which required a hearing. The affidavit served its purpose of informing appellant and the trial court that the State took issue with the facts asserted by appellant in his motion for change of venue and in his supporting affidavits. See *DeBlanc v. State*, 799 S.W.2d, at 704; and *Cockrum v. State*, 758 S.W.2d, at 583. We conclude that the State's controverting affidavit was not flawed. Point of error two is overruled.

■ In his third point of error, appellant argues the trial court erred at voir dire by excusing people over the age of 65. Appellant states that excusing this group "excludes a definable section of the population from serving on juries and denies appellant his right to a jury chosen from a fair cross section of the population," thereby violating his rights under the Fourteenth Amendment to the United States Constitution and the Texas Constitution. Appellant contends that this practice constitutes age discrimination, which violates appellant's right to equal protection of the laws and his right to a jury drawn from a cross section of the community. Appellant makes no arguments under the Texas Constitution. Appellant relies upon the Supreme Court's discussion of the need to eliminates racially discriminatory practices in jury selection in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Appellant cites no specific authority for his argument under the Federal Constitution.

---

13. TEX.R.CRIM.EVID. 602 sets out:

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he had personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This rule is subject to the provisions of Rule 703, relating to opinion testimony by expert witnesses."

14. TEX.CODE CRIM.PROC.ANN. Art. 31.04 sets out:

"The credibility of the persons making affidavit for change of venue, or their means of knowledge, may be attacked by the affidavit of a credible person. The issue thus formed shall be tried by the judge, and the motion granted or refused, as the law and facts shall warrant."

*Batson* is substantively distinguishable from the instant case.

We note that *Batson* dealt with a State's efforts, through its prosecuting attorneys, to exercise discretionary peremptory challenges to exclude minorities from jury service, not trial court compliance with statutory excusals. In the instant case, the statute, TEX. GOVT.CODE ANN. § 62.106(1), provides only for a personal, optional exemption from jury service which may be invoked by a venireperson. It does not provide for a statutory exclusion or mandatory disqualification. Nothing in § 62.106(1) implies that persons over the age of 65 are not fit for, or incapable of, or unwanted for jury service. *Batson* is not controlling authority for this point of error.

This Court has previously dealt with equal protection claims against the juror exemption statute. In *Johnson v. State*, 548 S.W.2d 700 (Tex.Cr.App.1977) [15], this Court held that the statute's optional exemptions for persons with legal custody of children under the age of ten and for persons enrolled in an institution of higher learning did not violate due process or equal protection under either the United States Constitution or the Texas Constitution. *Johnson v. State*, 548 S.W.2d, at 703–704. This Court concluded that the State had a "legitimate interest in creating this optional exemption because it allows those persons most likely to have a legitimate claim of hardship to present it in an orderly manner." *Johnson v. State, Id.*

Though this Court has not written on the constitutionality of §§ (1), the Dallas Court of Appeals has confronted the issue. In *Weaver v. State*, 823 S.W.2d 371 (Tex.App.–Dallas 1992), review refused, the Court of Appeals found that §§ (1) did not violate the fair cross section of the community requirement of the Sixth Amendment. U.S. CONST. AMEND. VI. *Weaver v. State*, 823 S.W.2d, at 373–374. The Court of Appeals also held that §§ (1) did not violate the equal protection provisions of the Texas Constitu-

tion. TEX. CONST. Art. 1, §§ 3 & 3a. The Court of Appeals, relying upon *Johnson v. State*, found the State had a legitimate interest in providing an age exemption from jury service because it provides an orderly and efficient method of speeding up the operation of the overloaded judicial system. Without the exemption, persons over the age of 65 "would have to personally and individually present any claims of hardship to the trial court." *Weaver v. State*, 823 S.W.2d, at 374. The Court of Appeals concluded "that the age-based classification bears a fair and substantial relation to the objects that the legislation was designed to accomplish." *Weaver v. State*, 823 S.W.2d, at 375. Though not controlling, we finds the reasoning of the Court of Appeals in *Weaver* to be persuasive.

We find that § 62.106(1) does not violate appellant's right to equal protection of the laws and his right to a jury drawn from a fair cross section of the community under either the United States Constitution or the Texas Constitution. *Johnson v. State;* and *Weaver v. State.* Point of error three is overruled.

◼ In his fourth point of error, appellant argues the trial court erred when it excused people from jury service because they could not read or write the English language, pursuant to TEX.GOVT.CODE ANN. § 62.102(5). Granting this excuse to potential jurors "excludes a definable section of the population from servicing on juries and denies the defendant his right to a jury chosen from a fair cross section of the population, in violation of the defendant's rights under the 6th and 14th amendments to the United States Constitution and the Texas Constitution." Appellant contends the policy of granting these excusals is rooted in racial discrimination.

Appellant relies upon his assertion that "the majority of the citizens of this State who cannot read or write the English language are Hispanic." Appellant states in his brief, "it cannot be argued that citizens of this State who do not read or write the English

---

**15.** In *Johnson,* this Court interpreted TEX.CIV. STAT.ANN. Art. 2135 (repealed). After being repealed, Art. 2135 was replaced by TEX. GOVT.CODE ANN. § 62.106.

language, are not the equals in society of those who can read or write the English language." Appellant then compares illiterate people to deaf people, the latter being a group whom appellant states the trial courts accommodate by obtaining interpreters.

Appellant cites no authority for this comparison. He has overlooked TEX. GOVT.CODE ANN. § 62.1041(b), which provides:

"A deaf person is disqualified to serve as a juror if, in the opinion of the court, his deafness renders him unfit to serve as a juror in that particular case."

In concluding that § 62.102(5) denied his right to be tried by as jury drawn from a "proper cross-section of the community" and his right to equal protection, as provided by the United States Constitution and the Texas Constitution, appellant cites no authority, either Federal or State. Appellant makes no separate and distinct argument under the Texas Constitution, but lumps together the Texas Constitution and the United States Constitution in the presentation of one argument on appeal.

In response, the State asserts that appellant did not object at trial to these excusals. At one point, the trial court asked the parties if there were any objections to the persons who "claimed disqualifications that they couldn't read and write, and I think one who had been convicted." Appellant replied, "None by the defendant, your honor."

However, immediately prior to this exchange, when the trial court asked the parties, "Exemptions number 2 and number 3, are there any objections to those claiming 2 and 3?", appellant responded,

"With respect to those under number 3, Your Honor, we would interpose the same objection we made to the excusion (sic) and non-inclusion of those persons listing exemption number 1.[16] "

Earlier, the court coordinator had identified exemption number 3 as "unable to read or

write English." As the record is unclear, we will not base our decision upon whether or not the error was preserved.

Instead, we reject appellant's argument for his failure to adequately present or preserve his claim of covert racial discrimination against Hispanics, and the resulting denial of his constitutional rights, through the trial court's reliance upon § 62.102(5). In order to establish a violation of the fair cross-section requirement, appellant needs to have shown that Hispanics are a distinctive group in the community, that the representation of this group in venires is not fair and reasonable in relation to the number of such persons in that group in the community, and the underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, at 364, 99 S.Ct. 664, at 668, 58 L.Ed.2d 579 (1979); and *Weaver v. State*, 823 S.W.2d, at 373. Because appellant failed to show in the instant case both that the jurors excused pursuant to § 62.102(5) were Hispanic, and that Hispanics were not fairly and reasonably represented on the venire, we find appellant has failed to present a prima facie violation of the fair cross-section requirement of the United States Constitution. *Timmel v. Phillips*, 799 F.2d 1083, at 1086 (5th Cir.1986); and *Weaver v. State, Id.* Because appellant grouped his federal and state constitutional arguments, we overrule both of appellant's fair cross-section requirements. Appellant's fourth point of error is overruled.

In his fifth point of error, appellant argues the trial court erred when it overruled his "challenge to juror Dorothy Grmela, based on her inability to distinguish between the terms "intentional" and "deliberate", and such incorrect ruling forced defendant to exercise a peremptory strike to cure the error."

■ In order to present reversible error because of a trial court's denial of a requested challenge for cause, four requirements must be satisfied at trial. *Jones v. State*, 833 S.W.2d 118 (Tex.Cr.App.1992); *Demouchette v. State*, 731 S.W.2d 75 (Tex.Cr.App.1986),

16. Exemption number 1 was for those persons over the age of 65.

cert. denied, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). First, an appellant must demonstrate that he was forced to use a peremptory strike on a juror who was challengeable for cause. *Id.* Additionally, he must prove that he exhausted all of the peremptory strikes he was given. *Id.* Next, an appellant must show that he requested additional peremptory strikes and that this request was denied. *Id.* Finally, he must demonstrate that he was forced to accept a juror which he found objectionable. *Id.*

Appellant satisfied all four requirements in the instant case, ultimately showing that he was forced to accept a juror which he found objectionable, Lavalta Willis. Appellant has preserved for review the issue of whether his challenge for cause to juror Grmela was properly overruled.

▮▮▮▮ A juror may be excused for cause by a defendant if he has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which a defendant is being prosecuted or as a mitigation thereof or of the punishment therefore. TEX.CODE CRIM. PROC.ANN. Art. 35.16(c)(2). However, a trial court's decision to deny a defendant's challenge for cause should not be overturned unless, in light of the entire voir dire examination of the prospective juror, bias or prejudice has been established as a matter of law. *Little v. State*, 758 S.W.2d 551, at 556 (Tex. Cr.App.1988), cert. denied, 488 U.S. 934, 109 S.Ct. 328, 102 L.Ed.2d 346 (1988); see *Anderson v. State*, 633 S.W.2d 851 (Tex.Cr. App.1982). If bias or prejudice is not established as a matter of law, all of the venireperson's voir dire answers must be reviewed to determine whether they may set aside their views and honestly and truthfully follow the juror's oath. *Anderson v. State*, 633 S.W.2d, at 854; *Williams v. State*, 773 S.W.2d 525 (Tex.Cr.App.1988), cert. denied, 493 U.S. 900, 110 S.Ct. 257, 107 L.Ed.2d 207 (1989). The trial judge is in the best position to make this determination and his ruling will therefore be given due deference. *Farris v. State*, 819

S.W.2d 490 (Tex.Cr.App.1990); *Fearance v. State*, 771 S.W.2d 486 (Tex.Cr.App.1988); *Mooney v. State*, 817 S.W.2d 693 (Tex.Cr. App.1991). The standard of review turns on whether the trial court abused its discretion by overruling the challenge for cause. *Little v. State*, 758 S.W.2d, at 556; *Fuller v. State*, 827 S.W.2d 919, at 924 (Tex.Cr.App.1992), cert. denied, —— U.S. ——, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993); and *Cooks v. State*, 844 S.W.2d 697, at 709 (Tex.Cr.App.1992), cert. denied, —— U.S. ——, 113 S.Ct. 3048, 125 L.Ed.2d 732 (1993) (the testimony of the questioned venireperson shall be reviewed "as a whole"). In determining abuse of discretion, this Court shall review the record and determine if it supports the trial court's implied finding that the prospective juror's views would not "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *Wainwright v. Witt*, 469 U.S. 412, at 424, 105 S.Ct. 844, at 852, 83 L.Ed.2d 841 (1985); *Cockrum v. State*, 758 S.W.2d 577, at 592 (Tex.Cr.App.1988); and *Fuller v. State, Id.*

▮▮▮▮ The voir dire of Grmela shows that she initially could not agree that the legislature intended a different meaning between the words "intentionally" and "deliberately". Grmela also told counsel for appellant that she believed the two words to mean the same thing.

In rehabilitation, the State explained to Grmela that if the legislature intended for the two words to have the same meaning, they would have used "intentionally" in the phrasing of the first special issue instead of the word "deliberately". Grmela stated she could agree with that. The State then asked Grmela if she could attribute a different meaning to "deliberately", "that deliberately means more than intentionally", in order to follow the law and be a qualified juror. Grmela responded that she could. Grmela repeatedly told the State that she would not automatically vote "yes" on special issue number one only because she found appellant guilty of the instant offense, because she

could keep in her mind that deliberately means more than intentionally. Grmela assured the State that she could follow the law, taking into account all the circumstances, and require the State to prove beyond a reasonable doubt that the answers to the first and second special issues should be "yes" before she would give appellant the death penalty. Later Grmela stated that she could be a fair juror and consider all the circumstances of the instant case.

We find that the record, when viewed as a whole, supports a finding that Grmela's initial misunderstanding of the distinction between the meanings of intentional and deliberate would not interfere with the performance of these duties. Her voir dire reveals that she could follow the law and require the State to prove more to her than intentional actions by appellant before she could vote yes on the first special issue. An isolated statement, as this Court viewed venireperson Luttrull's statement that "he did not consider a deliberate act to require more than an intentional act" in *Cooks*, "will not require that a juror be struck for cause when his testimony taken as a whole indicates that he is not biased." *Cooks v. State*, 844 S.W.2d, at 711.

We hold that the trial judge was in the best position to determine if Grmela's views would impair the performance of her duties as a juror. His decision to overrule appellant's challenge for cause was not an abuse of discretion. *Cooks v. State*, 844 S.W.2d, at 711; *Fuller v. State*, 827 S.W.2d, at 924; and *Ellason v. State*, 815 S.W.2d 656 (Tex.Cr. App.1991). As such, we will defer to the trial judge's ruling. The fifth point of error is overruled.

■ In his sixth, seventh, eighth, ninth, tenth, and thirteenth points of error, appellant contends that the trial court erred when it overruled his objection to the State's "incorrect definition" of the term "criminal acts of violence" in the questioning of, respectively, venirepersons Larry Lenamon, Rebecca King, Herbert Pirelo, Thomas Tipton, Dan Fulton and Lavalta Willis. Appellant states

that he was forced to exercise peremptory strikes against Lenamon, King, Pirelo, Tipton and Fulton, and that he was forced to accept Willis after the trial court refused to grant him more strikes.

In each point of error, appellant argues that under the State's definition, "any criminal act can be a crime of violence and justify an affirmative finding to Special Issue Number Two." Because these jurors were each tainted by an erroneous definition of the phrase "criminal act of violence," appellant claims they were each challengeable for cause. Appellant relies upon *Martinez v. State*, 763 S.W.2d 413 (Tex.Cr.App.1988) to support these points of error. In *Martinez*, the State used an improper hypothetical to create a false distinction between the definitions of the terms "intentional" and "deliberate", thereby exposing the venireperson to a misconception of the law of capital murder. *Martinez*, 763 S.W.2d, at 425. We find *Martinez* to be distinguishable from the instant case.

■ In the instant case, the six venirepersons in question were not exposed to false definitions of the phrase "criminal act of violence" in the second special issue. Under the law of this State, crimes against property can be crimes of violence. In *Hamilton v. State*, 676 S.W.2d 120 (Tex.Cr.App.1984), this Court held that "arson is a crime of violence, per se." *Hamilton*, at 121. In *Gardner v. State*, 699 S.W.2d 831 (Tex.Cr.App.1985), this Court ruled that the question of whether a burglary was an act of violence "was a question of fact for the jury to decide." Even though burglary, unlike arson, is not a crime of violence per se, "the determination of whether a particular burglary is (a crime of violence) must depend on the facts and circumstances of each case." *Gardner*, at 835–836.

■ In *Drew v. State*, 743 S.W.2d 207 (Tex.Cr.App.1987), this Court discussed the phrase "criminal acts of violence that would constitute a continuing threat to society," holding that "there is nothing in our case law

to limit this portion of Article 37.071(b)(2), to future murders." This Court cited with approval the holding in *Hamilton* wherein arson was found to be a crime of violence, per se. *Drew*, at 211. In light of these past decisions, the record of the voir dire of the six venirepersons in question reveals they were not exposed to a misconception of the law of capital murder, unlike the venireperson in *Martinez*.

In the instant case, the State attempted to determine if each venireperson could consider, or conceive, that a crime against property, whether it be an arson or burglary, could be a crime of violence.[17] The State did not seek to commit each venireperson to the position that a crime against property was always a crime of violence. With each venireperson, the State relied upon arson and burglary as the types of crimes against property that could be crimes of violence.

The State asked Lenamon if he could conceive that a criminal act of violence might constitute an act like arson or burglary of a habitation. King was asked if she "could consider the possibility that an act of violence could occur in the course of committing say a burglary or committing arson." Pirelo affirmatively answered the following question:

"I'm asking you if our example of what might constitute a criminal act of violence is if I burn down a house, somebody's house, their castle, or if I break into somebody's house and commit burglary while they're not home ...

(INTERRUPTION BY DEFENSE OBJECTION)

"can you consider that it might be, arson or burglary of a habitation or some other type of crime against property, can you consider that could be a criminal act of violence?"

The State asked Tipton if he could consider that a criminal act of violence could be the burglary of a person's home or the arson of a person's home. Fulton was asked if he could conceive of criminal conduct against property "such as arson, burning down a house, such as breaking into and burglarizing a house" as constituting a criminal act of violence. Lastly, Willis affirmatively answered whether she could consider that a crime against property, such as arson or burglary of a habitation, or burglary of a building, could also constitute a criminal act of violence. The State cautioned each of the six venirepersons that they were not being committed to finding that a crime against property was an act of violence. The intent of the State's questioning was to determine if the venirepersons could conceive of an arson or burglary constituting a crime of violence.

▮ Appellant's argument, that the State led these six venirepersons to believe that "any criminal act can be a crime of violence," misrepresents the record. The voir dire of these six people reveals that the State sought to determine if they could conceive of a situation where an arson or a burglary would be a crime of violence, while being careful not to have them commit themselves to that position. As explained above, arson is a crime of violence, per se. *Hamilton v. State*, 676 S.W.2d, at 121. Burglary can be a crime of violence depending on the specific facts of the offense. *Gardner v. State*, 699 S.W.2d, at 835–836. These crimes against property, as the examples used by the State, can be crimes of violence. It was proper for the State to ask these six people, as potential triers of fact, whether they could consider a crime against property to be a crime of violence in the context of the second special issue. We find these jurors were not tainted by the State's definition of criminal act of violence. The trial court did not err when it

---

**17.** We do not find *Garrett v. State*, 851 S.W.2d 853 (Tex.Cr.App.1993) to be controlling, as it is factually distinguishable from the instant case. In *Garrett*, the State, citing a bias against the law upon which the State was entitled to rely, successfully challenged for cause venirepersons who testified they could not vote "yes" on the second special issue based solely on the evidence introduced during the guilt-innocence stage to prove the facts of the offense. In the instant case, the six venirepersons did not indicate a bias or prejudice against any phase of the law. There was no challenge, either granted or denied, because the instant venirepersons were allegedly biased against a phase of the law. *Garrett* is not controlling.

denied appellant's challenges for cause. The sixth, seventh, eighth, ninth, tenth, and thirteenth points of error are overruled.

■ In his eleventh point of error, appellant contends the trial court erred in overruling his second challenge to juror Dan Fulton on the grounds that he would not be able to give consideration to the case because of concerns regarding his business and that he was forced to exercise a peremptory strike to cure such error.

There is no "personal business" reason set out as grounds for a challenge for cause in the statute. See TEX.CODE CRIM.PROC. ANN. Art. 35.16(a), (b), or (c). This is not a case wherein a venireperson sought to be excused for business reasons under the discretion of the trial court. See TEX. GOVT.CODE ANN. § 62.110. Appellant asserts that Fulton's preoccupation with business concerns would prevent him giving fair consideration to appellant's case, thereby rendering him incapable of being a fair and impartial juror. See Art. 35.16(a)(9), *Id.* In *Smith v. State,* 641 S.W.2d 248 (Tex.Cr.App. 1982), this Court found it is sufficient to challenge under 35.16(a)(9) when the juror states that he or she could not be fair and impartial. Appellant argues that this is such a case.

Appellant relies on *Sosa v. State,* 769 S.W.2d 909 (Tex.Cr.App.1989), wherein a venireperson was challenged for cause because she testified that her family situation was such that she would not be able to reach a decision in the case and thus could not be a fair and impartial juror. This Court held the trial court did not err in granting the challenge for cause. *Sosa v. State,* at 918. See, also, *Rogers v. State,* 774 S.W.2d 247, at 253–254 (Tex.Cr.App.1989); and *Moore v. State,* 542 S.W.2d 664 (Tex.Cr.App.1976). However, the record of voir dire indicates the instant case is distinguishable from *Rogers, Sosa,* and *Moore.*

At first, Fulton told the prosecutor that he believed that he could give enough of his attention to the instant case to be a fair and impartial juror. On cross-examination, Fulton replied "yes" when appellant asked him if his "interest would be diverted to the point that you probably should not sit on this case?" Appellant then challenged Fulton for cause. When the State resumed voir dire, Fulton answered that he felt that he could be a fair and impartial juror. Fulton then explained,

> "Well, I mean I just want to elaborate a little bit. I have no problem with serving on the jury. I think that I would be an impartial juror and as far as my work load at the office here or Dallas, either one, I could manage that. I've been managing it a long time. That's not going to influence me. The situation in Dallas is a new business venture that I would be heading up which is a new circumstance for me, and again the chances of that even, though it may be a little better than fifty-fifty, are definitely not concrete at this point. It's hard for me to say that if this new venture that I'm alluding to starts, the problem would be I'd have to be in two locations at the same time. Again, that's not concrete. It's something that's still fairly elusive and—but with regard to my normal responsibilities, civic or business, I have no problem dealing with that."

The trial court then overruled appellant's challenge.

As stated above, the trial judge is in the best position to make this determination and his ruling will therefore be given due deference. *Farris v. State,* 819 S.W.2d 490; *Fearance v. State,* 771 S.W.2d 486; *Mooney v. State,* 817 S.W.2d 693. The standard of review turns on whether the trial court abused its discretion by overruling the challenge for cause. *Little v. State,* 758 S.W.2d, at 556; *Fuller v. State,* 827 S.W.2d, at 924; and *Cooks v. State,* 844 S.W.2d, at 709 (the testimony of the questioned venireperson shall be reviewed "as a whole"). In determining abuse of discretion, this Court shall review the record and determine if it supports the trial court's implied finding that the prospective juror's views would not "prevent or substantially impair the performance of his

duties as a juror in accordance with his instructions and oath." *Wainwright v. Witt,* 469 U.S., at 424, 105 S.Ct., at 852; *Cockrum v. State,* 758 S.W.2d, at 592; and *Fuller v. State, Id.*

We find the record "as a whole" supports the trial court's decision to overrule appellant's challenge for cause. Fulton's testimony indicated that his personal business affairs would not prevent or impair his performance of his duties as a juror, and would not keep him from being a fair and impartial juror. The trial court did not abuse its discretion in overruling appellant's challenge of Fulton. The eleventh point of error is overruled.

In his twelfth point of error, appellant asserts the trial court erred when it overruled appellant's challenge for cause of Edward Arredondo "on the grounds that he would not be able to give consideration to the case because of concerns regarding his business," and that he was forced to exercise a peremptory strike to cure such error. Appellant makes the same argument here that he made in his eleventh point of error.

Appellant asserts that Arredondo's preoccupation with business concerns would prevent him giving fair consideration to appellant's case, thereby rendering him incapable of being a fair and impartial juror. See Art. 35.16(a)(9), *Id.;* and *Smith v. State,* 641 S.W.2d 248. Appellant relies, as he did in point of error eleven on *Sosa v. State,* 769 S.W.2d, at 918. See, also, *Rogers v. State,* 774 S.W.2d, at 253–254; and *Moore v. State,* 542 S.W.2d 664. However, the record of the voir dire of Arredondo indicates the instant case is distinguishable from *Rogers, Sosa,* and *Moore.*

Arredondo explained that he was self-employed in the computer field, and that his clients depended on him to handle problems as they arose. He said he did not know if a problem would or would not arise, but that if it did, it would cause him some anxiety. In spite of this potentiality, Arredondo told the State that if he was selected, he would do his duty and do whatever was required of him. Arredondo answered "yes" when the State asked him if he could be a fair and impartial juror for both sides. On cross-examination, Arredondo told appellant that it was possible that he might lose some concentration and that a problem at work could affect him. But he also told appellant that he would not be unfair.

The State asked Arredondo on re-direct that if he was working on a major problem for his best client, as appellant proposed in a hypothetical, and another major problem came up for another client, "would that second client's problems override your professional responsibility and your duty to your first client and cause you to do a less thorough job in taking care of his needs?" Arredondo answered, "No way." The State then asked, "By the same token, in this case if you take a solemn oath as a juror to render a true verdict based on the evidence and the law and knowing that a man's life is at stake here, would you allow any outside influence to affect your ability to follow that oath, follow the law and the evidence?" Arredondo replied, "No, that—No." The trial court then overruled appellant's challenge for cause.

We will defer to the trial court's position to determine Arredondo's ability to be a fair and impartial juror, and his ability to comply with his oath and instructions. *Farris v. State,* 819 S.W.2d 490; *Fearance v. State,* 771 S.W.2d 486; *Mooney v. State,* 817 S.W.2d 693. We conclude the record "as a whole" supports the trial court's decision to overrule appellant's challenge for cause. Arredondo's testimony indicated that his personal business affairs would not prevent or impair his performance of his duties as a juror, and would not keep him from being a fair and impartial juror. The trial court did not abuse its discretion in overruling appellant's challenge of Arredondo. The twelfth point of error is overruled.

In his fifteenth point of error, appellant asserts the trial court erred when it admitted evidence "of statements made to an

investigating officer by the deceased and another witness regarding a description of the person who perpetrated the alleged offense."

At trial, Detective J.R. Price testified for the State. Over appellant's hearsay objections, the State asked Price:

STATE: After talking to Jesse Contreras, and please let me remind you not to tell me what if anything Mr. Contreras told you, did you go searching or looking for a particular description of an individual?

PRICE: Yes, sir.

STATE: What is that?

PRICE: A black male, somewhat smaller build than Mr. Contreras, having in his possession a black ski mask or toboggan type cap.

.    .    .    .    .

STATE: After talking to Victor Macias, and again not telling me what, if anything, he told you, would you tell me if you went looking for a particular description of an individual?

PRICE: Yes, sir.

STATE: Tell the Court or the Jury what description of individual you went looking for?

PRICE: Again, a Black male, small build, approximately 5'6" to 5'7".

Appellant cites no authority for his assertion that the above testimony is inadmissible hearsay. The State responds that Price's testimony does not meet the definition of hearsay because it was not "offered in evidence to prove the truth of the matter asserted." TEX.R.CRIM.EVID.R. 801(d).

We find that Price's statements regarding the fact that he spoke with the victim, Contreras, and the witness, Macias, and then issued a description of an individual, were inadmissible hearsay. As in Schaffer v. State, 777 S.W.2d 111 (Tex.Cr.App.1989), the State indirectly elicited hearsay testimony from Price when it asked him what particular description of an individual he went looking

for after questioning Victor Macias and Jesse Contreras. Schaffer v. State, 777 S.W.2d, at 114. We hold the trial court improperly allowed the State to introduce hearsay testimony before the jury. Schaffer, id.

However, unlike Schaffer, we conclude in the instant case that a substantial right of the appellant was not affected by this erroneously admitted hearsay. TEX.R.CRIM. EVID. 103(a). Other testimony was admitted at trial that proved the same facts the State sought to prove through the inadmissible hearsay testimony of Price. Anderson v. State, 717 S.W.2d 622, at 628 (Tex.Cr.App. 1986). As pointed out earlier in this opinion, Victor Macias testified at trial that he saw a short black man running from Jesse Contreras' store. At trial, Gloria Diaz, Jesse Contreras' daughter, testified that when she arrived at the murder scene, her father told her that a black man with a mask had shot him. Even though appellant objected to Diaz' testimony as being hearsay, the trial court concluded that it was admissible as a dying declaration. As pointed out in point of error nineteen, infra, Diaz' testimony was admissible for that reason. Because the testimony at trial of Macias and Diaz proved the same facts that the State sought to admit through the testimony of Price, we conclude that Price's erroneously admitted hearsay testimony did not harm appellant. Anderson v. State, 717 S.W.2d, at 628. See, also, Mayes v. State, 816 S.W.2d 79, at 88 (Tex.Cr. App.1991); and Love v. State, 833 S.W.2d 264, at 266 (Tex.App.—Austin, 1992). The fifteenth point of error is overruled.

By way of point of error sixteen, appellant argues that the trial court erred in admitting evidence of him attempting to purchase bullets some seven to ten days prior to the date of the charged offense. Appellant believes such evidence was not in any way connected to the offense charged and was an inadmissable extraneous act.

Evidence at trial established that the victim in the instant offense was killed with .25 caliber bullets. Appellant concedes this fact in his brief. During the testimony of State's

witness Johnny Cruz, appellant made a very nonspecific objection. He argued outside the presence of the jury that the witness should not be permitted to testify that appellant had come into the witness's grocery store seven to ten days before the day of the murder inquiring whether the store sold .25 caliber ammunition. Appellant contended that this evidence should not be admitted since purchasing bullets is a legal act and furthermore that Cruz did not sell him any ammunition. Appellant did not argue in his trial objection that requesting the bullets was an inadmissable extraneous act. Nor did he argue that the probative value of the evidence was outweighed by its prejudicial effect. The objection was overruled. The witness proceeded to testify that appellant had indeed come into his grocery store seven to ten days before the offense seeking .25 caliber bullets. Cruz informed appellant that he did not sell handgun ammunition.

A timely and reasonably specific objection is necessary in order to preserve error for appellate review. TEX.R.APP.PRO. 52(a). Arguments which are not supported by a trial objection are deemed overruled. *Ransom v. State*, 789 S.W.2d 572, at 583 (Tex.Cr.App.1989).

Relevant evidence is any evidence which tends to make the existence of any fact that is of consequence more or less probable. TEX.R.CRIM.EV. 401. All relevant evidence is admissible. TEX.R.CRIM.EV. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. TEX.R.CRIM.EV. 403.

We find that in the absence of an "inadmissable extraneous act" objection, no error was preserved on this aspect of appellant's argument. It is therefore overruled. *Ransom*, supra. Further, we find that the evidence of appellant attempting to purchase .25 caliber ammunition seven to ten days prior to the charged offense was relevant. TEX.R.CRIM.EV. 401. Bullets of this caliber were used in the instant offense. The

fact that appellant was trying to acquire .25 caliber ammunition about a week before the crime made the fact that appellant was involved in the crime more probable. *Id.* Because we find that this evidence was relevant, we hold that it was not error to admit it. TEX.R.CRIM.EV. 402. Point of error sixteen is therefore overruled.

In his seventeenth point of error, appellant contends the trial court erred when it admitted testimony that appellant solicited "help in a robbery a month prior to the date of the charged offense, as such evidence was not in any way connected to the offense charged, and was an inadmissible extraneous act." In his eighteenth point of error, appellant contends the trial court erred when it admitted "evidence of a conversation overheard between [appellant] and the alleged accomplices on the day prior to date of the offense charged, as such evidence was not in any way connected to the offense charged, and was an inadmissible extraneous act." In these two points of error, appellant attacks the admission of Ike Weeks' testimony into evidence.

Weeks' testimony is set out above in the summary of the State's evidence in point of error fourteen, wherein appellant contended there was insufficient evidence to support the testimony of the accomplice, Aaron Bilton. As set out above, Weeks testified appellant asked him in late December to participate in a robbery. Appellant left Waco and went to the Valley, coming back in late January. The first time Weeks saw appellant after his return from the Valley, appellant asked Weeks if he had any bullets or knew anybody that did. Appellant either wanted .25 calibre bullets or .32 calibre bullets.

Weeks also testified that on the day before the offense, he saw appellant, Aaron Bilton and Mark McConnell in an alley behind their Uncle's house (Weeks explained that appellant, Bilton and McConnell were all his cousins). Weeks overheard appellant tell Mark "you know what you've got to do," and that he would call him the next day at 9:00 a.m. so that Mark could pick him up, and that Mark

would receive a $10.00 bag of marihuana and "some of the money."

Appellant objected that this was inadmissible testimony of "generic extraneous offenses." The State responded that the testimony was admissible because it was relevant to appellant's planning of the instant robbery. When reviewing Weeks' testimony on these points of error, we have examined all of the evidence admitted at trial to determine if, in the context of the instant offense, the testimony was relevant. In *Mann v. State*, 718 S.W.2d 741 (Tex.Cr.App.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1633, 95 L.Ed.2d 206 (1987), this Court explained that evidence of the context of an offense "is always admissible [because] events do not occur in a vacuum and the jury has a right to have the offense placed in its proper setting so that all the evidence may be realistically evaluated." *Mann*, at 744. The evidence at trial supports the State's contention that appellant planned the instant offense from December until late January, and that the testimony of Ike Weeks was relevant to those plans.[18]

Aaron Bilton testified that in late December he was with appellant and Ike Weeks. After Bilton motioned for Ike to come over to talk, Bilton walked away, leaving Weeks and appellant alone together. As Bilton left, he saw Weeks and appellant talking. Later, Bilton said that appellant told him that he needed money. Bilton also testified that on the day before the robbery, he was with appellant and Mark McConnell when they discussed the plans for the robbery, and appellant told McConnell of his role in the robbery of Jesse's Tortilla Factory. This was the conversation which Weeks testified that he overheard.

Weeks also testified about seeing Mark McConnell after the conversation wherein he witnessed appellant promising McConnell marijuana and "some of the money". Later that same day, Weeks saw McConnell smoking some marihuana. The next day, after the robbery, Weeks saw Mark McConnell at his girlfriend's house without his car. Weeks asked McConnell where his car was, and McConnell told him that he parked it in his father's back yard.

At trial, the State proved that appellant planned and carried out a robbery, in which he also committed the murder of the man who he planned to rob. In putting together and carrying out his plans, appellant solicited the help of members of his family, including Weeks, Bilton and Mark McConnell. Weeks' testimony regarding appellant's conversations and actions from late December until January were part of appellant's plan and preparations to carry out a robbery at Jesse's Tortilla Factory. They were admissible as proof of those plans and preparations, pursuant to TEX.R.CRIM.EVID.R. 404(b).[19]

Also, Weeks' testimony was admissible as proof of actions within the same transaction as the instant offense. Appellant was indicted for the murder of Jesse Contreras in the course of committing a robbery of Contreras. The testimony of Ike Weeks contributed to proving appellant's intent to commit the instant robbery and his efforts to prepare for, and carry out, that robbery. As such, Weeks' testimony proved actions by appellant within the same transaction as the instant offense. Weeks' testimony was admissible as "same transaction contextual evidence," which is deemed an exception to the propensity rule of 404(b). *Mayes v. State*, 816 S.W.2d 79, n. 4 at 86 (Tex.Cr.App.1991). Weeks's testimony did not involve proof of some unknown "generic extraneous offenses" committed by appellant. Points of error seventeen and eighteen are overruled.

---

18. TEX.R.CRIM.EVID.R. 401 sets out:
    "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

19. RULE 404(b) sets out, in part:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, . . ."

In his nineteenth point of error, appellant argues the trial court erred when it admitted "into evidence statements allegedly made by the deceased to his wife and daughter, as such statements constituted hearsay, and did not constitute dying declarations." Appellant claims the admission of the deceased's dying declarations did not comply with TEX. R.CRIM.EVID.R. 804(b)(2).[20]

Appellant supports this argument with the assertion that Rule 804 "is essentially a codification" of TEX.CODE CRIM.PROC.ANN. Art. 38.20. Relying on this theory, appellant states that for a dying declaration to be admissible, the declarant must "hold no hope for recovery." Appellant contends the State failed to prove at trial that the deceased, Contreras, was aware that his death was imminent, and that he believed he had no hope for recovery. Appellant claims the predicate for the admission of the statements was destroyed when the treating physician explained that there was a chance for recovery at the time the statements were made. Appellant cites only pre-Rules cases for authority for his arguments. Appellant concludes that the dying declarations were inadmissible because the State did not show the deceased believed his death was imminent and that he had no hope for recovery.

■ Before getting into the issue of whether the record indicates that the deceased believed his death to be imminent at the time he made the statements, we take note of the fact that Rule 804(b)(2) does not require, as did its antecedent, that the declarant believe he had no hope for recovery. The drafters omitted that language from 804(b)(2).

In 33 GOODE, WELLBORN & SHARLOT, GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL

§ 804.4, at p. 612 (Texas Practice 1988), the authors discussed the omission of the language:

> "Third, while Rule 804(b)(2) requires that the declarant believed that his death was imminent, it does not insist that he "believed there was no hope of recovery." Several jurisdictions have held that the adoption of the Federal Rule language abolishes the extreme and unrealistic requirement of abandonment of all hope. (and cases cited therein.)"

Appellant erred in relying upon the argument that the State failed to prove the deceased believed he had no hope for recovery when he made the statements at issue. We do not hold that the State, as proponent of admission of the statements, had this burden, which is no longer required by the Rules. We turn our focus to the issue of whether the State proved that the declarant believed his death was imminent.

■ In his brief, appellant does not cite any place in the record where the deceased's wife and daughter testified about his dying declarations, where the treating physician testified about the deceased's condition at the time of the statements, or where appellant objected to their testimony and obtained a ruling. Because the right to appellate review extends only to complaints made in accordance with our rules of appellate review, appellant's complaint was not preserved for our review. TEX.R.APP.P. Rule 74(f); *Harris v. State*, 827 S.W.2d 949, at 958 (Tex.Cr.App.), cert. denied, —— U.S. ——, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992); *Castillo v. State*, 810 S.W.2d 180, n. 1 at 182 (Tex.Cr.App.1990); and *Foster v. State*, 779 S.W.2d 845, at 864 (Tex.Cr.App.1989), cert. denied, 494 U.S. 1039, 110 S.Ct. 1505, 108 L.Ed.2d 639 (1990).[21]

---

**20.** TEX.R.CRIM.EVID.R. 804(b)(2) sets out:
  **(b) Hearsay exceptions.** The following are not excluded if the declarant is unavailable as a witness:
  (2) Dying declarations. A statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.

**21.** Cf. *Morales v. State*, 820 S.W.2d 805, at 805–806 (Tex.Cr.App.1991); and *Davis v. State*, 817 S.W.2d 345, at 346 (Tex.Cr.App.1991) (wherein this Court held there was substantial compliance

What is more, we find the statements of the witnesses were admissible pursuant to Rule 804(b)(2). The deceased's daughter testified that at the time the deceased told her what happened and described his assailant, he also told her, "I think they got me in my heart." The deceased also repeatedly told her, "I never thought I'd go like this." He also asked her to forgive him "if he'd been a bad daddy." The deceased's wife testified she got to the scene before her daughter. The deceased told her, "I have been hit. They hit me in my heart. I am dying. And I want you to forgive me."

The testimony of the deceased's daughter and wife, concerning the deceased's statements about what happened to him, were admissible because they were made while the deceased believed that his death was imminent and because he wasn't available to testify at trial. Rule 804(b)(2); and GOODE, WELLBORN, AND SHARLOT, § 804.4, at p. 611. Point of error nineteen is overruled.

In his twentieth point of error, appellant argues the prosecutor's repeated statements during his questioning of the deceased's treating physician "were so inflammatory and prejudicial that an instruction to disregard them by the court was futile, and denied [appellant] a fair trial, due process of law and equal protection of the law." Appellant points to the following two questions:

(STATE): "If Jesse Contreras had not been shot like a dog by somebody—"

[Appellant objected that the question was "inflammatory." The trial court sustained the objection and instructed the jury to disregard the statement "for any purpose whatsoever."]

(STATE): "Doctor, if Jesse Contreras had not been shot on January the 20th of 1989, would this very Friday he be over at his tortilla factory making tortillas and sitting there cashing checks?"

[Appellant objected that the question called for speculation by the witness. The trial court sustained the objection and instructed the jury to disregard the statement "for any purpose."]

In both instances, the witness did not answer the question. The trial court overruled both of appellant's requests to declare a mistrial.

We hold that both questions, which sought to point out the effect of the absence of the deceased from the community where he worked, were not so inflammatory that their impression could not have been withdrawn from the trier of fact. Any harm was cured by the trial court's instructions to disregard. *Cooks v. State,* 844 S.W.2d 697, at 735 (Tex. Cr.App.1992); *Huffman v. State,* 746 S.W.2d 212, at 218–219 (Tex.Cr.App.1988); *Livingston v. State,* 739 S.W.2d 311, at 335 (Tex.Cr. App.1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). Point of error twenty is overruled.

In point of error twenty-one, appellant alleges that the trial court erred in allowing evidence of the arrest of defendant by the arresting officers, as evidence of flight, where no flight from arrest for the offense charge was shown.

Louis Davila, a former detective with the Harlingen Police Department, testified that he was driving down Commerce Street in Harlingen during March of 1989 and observed appellant walking down the sidewalk. Davila knew at the time that there was an outstanding arrest warrant for appellant for capital murder. Davila testified that he was in an unmarked car, in civilian clothes, and had his badge visible. While he was exiting the car, appellant began to run. The record reflects that Davila called appellant by his last name, although it is unclear whether appellant began to run before or after Davila did so. Davila did state, however, that he very loudly identified himself as a police officer just as appellant began to run and at that time appellant was fifteen or twenty feet away from him. The chase lasted approximately four minutes.

Appellant made several nonspecific objections during the testimony of Detective

with Rule 74(f), so that error was preserved for                    review on appeal, unlike the instant case).

Davila. Just after the witness was sworn, appellant stated the following:

> Your honor, at this time with the agreement of the State I would like the Court to notice that when I refer to the United State's Constitution and make any objection thereunder I am referring to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments. Further, that when I refer to the Constitution of the State of Texas I am referring to Article One, Sections 9, 10, 13, 15, and 19.

The next objection offered by appellant came when Detective Davila was describing what happened the moment the unmarked police car pulled over and appellant began to run. Appellant stated the following:

> Your honor, at this point I'll object under the Texas Constitution and the United State's Constitution.

The objection was overruled. Several other objections were made during the testimony of the witness, however they either took the preceding form or they were simply phrased as "(y)our honor, I object." Appellant never explained why he believed the evidence of flight was irrelevant or even objected on relevancy grounds.

A timely and reasonably specific objection is necessary in order to preserve error for appellate review. TEX.R.APP.PRO. 52(a). "As regards specificity, all a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Lankston v. State*, 827 S.W.2d 907, at 909 (Tex.Cr.App.1992). If a party fails to indicate his desire, reviewing courts may hold that appellate complaints have been lost. *Id.*

We find that appellant failed to preserve error at trial. The basis for his objection was not the proper grounds for exclusion of evidence of flight as proof of guilt, i.e. that the testimony was not relevant. Additional-

ly, even despite his notice to the court prior to the witness' testimony, his objection was vague and multifarious. Furthermore, it failed to put the trial court on notice of **any** specific grounds for his objection and the remedy he sought. *Lankston,* supra. Given the insufficient objections, we find that error was not preserved; however, we will address appellant's argument in the interests of justice.

Evidence of flight is admissible as a circumstance from which an inference of guilt may be drawn. *Foster v. State*, 779 S.W.2d 845 (Tex.Cr.App.1989); *Rumbaugh v. State*, 629 S.W.2d 747 (Tex.Cr.App.1982); *Valdez v. State*, 623 S.W.2d 317 (Tex.Cr.App. 1981). Before such evidence is admitted, however, it must appear that it has some relevance to the offense under prosecution. *Rumbaugh v. State*, 629 S.W.2d, at 752 (wherein the defendant's escape from custody was held admissible on issue of guilt). Once this relevancy requirement is met, evidence of "escape from custody or flight to avoid arrest" are admissible unless the defendant shows that escape or flight were related to circumstances unrelated to the charged offense. *Id.* (In *Rumbaugh* this Court discusses flight and escape as equally admissible on the issue of guilt). Furthermore, flight is no less relevant if it is only flight from custody or to avoid arrest. *Foster v. State*, 779 S.W.2d, at 859. A lapse of time between commission of the offense and the defendant's flight does not always adversely affect admissibility of the flight. *Id.*

We find that the evidence of flight was admissible. From the record, it appears that the evidence had relevance to the instant offense. An arrest warrant had been issued for appellant at the time Detective Davila attempted to effectuate an arrest. Appellant had already fled from Waco to Harlingen after the commission of the instant offense. Davila clearly identified himself as a police officer when attempting to get appellant to stop. Since appellant was already identified as a suspect in the case, his flight when confronted by the police was relevant

to the issue of whether or not he committed the instant crime. *Rumbaugh,* supra. Since the relevancy requirement was satisfied, the burden was on appellant to prove that his flight to avoid arrest was related to circumstances unrelated to the charged offense. *Id.* No such showing was made by appellant. We therefore find that it was not error to admit the evidence and overrule point of error twenty-one.

In his twenty-second point of error, appellant argues the trial court erred by excluding the testimony of a defense witness that another person admitted killing the deceased. Outside the jury's presence, Regina Burks testified that three or four hours after the offense, she overheard Bishop McConnell III repeatedly state to two men, whom she did not know, "at the tree" that he shot Contreras. She further testified that he was very intoxicated and "[n]obody ever pays attention to him when he's drunk." The trial court sustained the State's objection that Regina Burks' testimony was hearsay and did not meet the requirements of the statement against penal interest exception to the hearsay rule.

■ Both appellant and the State rely upon *Ramirez v. State,* 543 S.W.2d 631 (Tex. Cr.App.1976). See also *Erwin v. State,* 729 S.W.2d 709 (Tex.Cr.App.1987); and *Perez v. State,* 590 S.W.2d 474, 480 (Tex.Cr.App.1979), cert. denied, 446 U.S. 937, 100 S.Ct. 2157, 64 L.Ed.2d 790 (1980). However, with the enactment of the Texas Rules of Criminal Evidence on September 1, 1986, rule 803(24) now governs statements against penal interest and supersedes the common law rule set forth in *Ramirez,*[22] *Erwin,* and *Perez.* Rule 803(24) provides that a statement against penal interest is any statement which when

said so far tended to subject the declarant to criminal liability that a reasonable person would not have made the statement unless he or she believed it to be true. TEX.R.CRIM. EVID. 803(24). "Rule 803(24) is significantly more liberal in the admission of statements against penal interest than was prior law." *Nauert v. State,* 838 S.W.2d 328, 330 (Tex. App.—Austin 1992, pet. ref'd); *see also* 33 STEVEN GOODE, OLIN G. WELLBORN III & M. MICHAEL SHARLOT, GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 803.29 (Texas Practice 1988 & Supp.1992). Under the rule, such statements are now admissible, if "corroborating circumstances clearly indicate the trustworthiness of the statement." TEX.R.CRIM.EVID. 803(24).

Rule 803(24) of the Texas Rules of Criminal Evidence is fashioned after rule 804(b)(3) of the Federal Rules of Evidence. In determining whether a statement is sufficiently trustworthy, Federal courts have looked to the circumstances surrounding the statement, including: (1) when and to whom the statement was made, (2) the existence of corroborating evidence, and (3) the extent to which the statement is really against the declarant's penal interest. *United States v. Pena,* 527 F.2d 1356, 1362 (5th Cir.), cert. denied, 426 U.S. 949, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976) (citing *Chambers v. Mississippi,* 410 U.S. 284, 300–01, 93 S.Ct. 1038, 1048–49, 35 L.Ed.2d 297 (1973)); *United States v. Slaughter,* 891 F.2d 691, 698 (9th Cir.1989) (citing *United States v. Oropeza,* 564 F.2d 316, 325 (9th Cir.1977), cert. denied, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978)). Courts have found a lack of trustworthiness when the declarant has a strong motive to lie,[23] will suffer little or no adversity by making the statement,[24] or has a desire

---

22. Under *Ramirez,* statements against penal interest were only admissible in circumstantial evidence cases. This Court abolished any distinction between the treatment of circumstantial and direct evidence by appellate courts. Cf. *Geesa v. State,* 820 S.W.2d 154 (Tex.Crim.App.1991); and *Hankins v. State,* 646 S.W.2d 191, at 199 (Tex. Crim.App.1983) (wherein this Court repudiated the jury instruction on the law of circumstantial evidence).

23. *See People v. Shortridge,* 65 N.Y.2d 309, 491 N.Y.S.2d 298, 480 N.E.2d 1080 (1985) (father's confession to killing was untrustworthy when he had a strong ulterior motive to exculpate his son).

24. *See United States v. Silverstein,* 732 F.2d 1338, 1346 (7th Cir.1984) (inmate's confession was untrustworthy because he was serving three consecutive life terms and therefore could not be subjected to significant punishment), cert. denied,

to gain favor with authorities.[25]

■ With these principles in mind, we turn to the present case. Bishop McConnell III's drunken admissions to this offense were statements against his penal interest since the admissions could have subjected him to criminal liability; therefore, the issue is whether the statements were sufficiently trustworthy. Bishop's admissions were made to two unidentified people while he was intoxicated, circumstances indicating a lack of trustworthiness. However, the statements were made only hours after the offense occurred, and the record does not reflect that Bishop had any reason to lie or that he would gain some advantage by admitting the offense. Further, other testimony corroborates the statements, giving support to a conclusion the statements were trustworthy.

Vincent Guillem testified that he saw Bishop one hour before the offense in the same car Victor Macias saw at the crime scene, even though he did not state that Bishop left with appellant. Because Macias did not identify appellant as the person he saw running toward that car at the crime scene, arguably, the person Macias saw could have been Bishop.[26] A pawn shop owner testified that Bishop purchased a Raven .25 caliber automatic pistol eight days before the offense, and as previously mentioned, a firearms expert testified that the murder weapon was probably a Raven .25 caliber automatic. In addition, Louis McConnell testified that he might have seen Bishop handle a small caliber gun about one week before the offense.

Aaron Bilton, the accomplice-witness, never testified that he saw appellant shoot Contreras or that appellant admitted shooting Contreras. He testified that he did not hear any gunshots and that he did not see appellant with a gun on the day of the offense, though he had seen appellant with a gun at Bilton's uncle's house. No gun was recovered from appellant. However, Bilton testified there were only three people in the car: himself, appellant and Mark McConnell, the driver.

The evidence sufficiently corroborates Regina Burks' testimony to render it admissible under R.803(24). Regardless of whether the jury would have actually believed the statements, appellant was entitled under R.803(24) to present them to the jury. We hold the trial court erred in excluding Regina Burks' testimony. *Cf. Green v. State*, 840 S.W.2d 394, 411–12 (Tex.Crim.App.1992), cert. denied, — U.S. —, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993). We next decide whether that error was harmless. TEX. R.APP.P. 81(b)(2).

■ "Rule 81(b)(2) mandates that the appellate court focus upon the error and determine whether it contributed to the conviction or the punishment." *Harris v. State*, 790 S.W.2d 568, 585 (Tex.Cr.App.1989). However, "the impact of the error cannot be properly evaluated without examining its interaction with the other evidence." *Id.* at 586. The question, then, is "whether a rational trier of fact might have reached a different result if the error and its effects had not resulted." *Id.* at 588. The appellate court must determine whether, beyond a reasonable doubt, the error made no contribution to the conviction or the punishment. *Perez v. State*, 824 S.W.2d 565, at 568 (Tex.Cr.App. 1992). An error is harmless if it did not interfere with the integrity of the trial process sufficiently to affect the outcome of the trial. *Harris v. State*, at 587; and *Perez, Id.*

■ We begin with a look at the interaction of the proffered testimony with other evidence from Regina Burks about Bishop

---

469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985).

**25.** *See United States v. Oliver*, 626 F.2d 254, 261 (2d Cir.1980) (statement against penal interest also implicating others by person held in custody was deemed untrustworthy).

**26.** However, Macias testified that he saw only two men in the car, the driver and the man who left the crime scene and jumped in the back seat. Guillem testified when he saw the car, Mark McConnell was driving.

McConnell's statements. She would also have testified that Bishop was "staggering" drunk, "about to fall," and "pretty out of it" when he made the statements. She would have explained that "nobody ever pays no attention to him when he's drunk," and that nobody believed him when he made the statements. Burks would also have testified that she initially told Detective Price that it was her mother, and not her, that heard these conversations, though at trial she explained the prior inconsistency by saying her mother heard it first before she did. She also admitted telling Detective Price that Bishop said, "We shot Jessie," though she explained this inconsistency also. Regina then testified that she was at Vincent Guillem's house on the day of the offense. When Mark McConnell drove off, she said that Bishop did not leave with them.

The state's case was based upon the testimony of appellant's accomplice, Bilton, and the corroboration of that testimony. See point of error 14, above. That corroboration included appellant's statements to his aunt, Norma Christmann, which appellant made two to three days after the murder of Contreras. See note 6, *infra.* In that admission, appellant stated there was not a witness left at the scene when he left Contreras' business. Appellant also threatened his aunt if she called the police.

Guillem's testimony that only Mark McConnell left in the car with appellant impeaches both Bishop's drunken statements to the two men at the tree, and the accomplice, Bilton's, statement. In its impeachment of Bilton's statement, however, Guillem's testimony combines with Macias' statement to form strong proof that appellant was the man Macias saw leave the scene and get in the back seat of the car Mark McConnell was driving. As mentioned above, Regina Burks would have supported the testimony that Bishop didn't leave with appellant.

In light of questionable credibility of Bishop McConnell's statements when he was drunk, as well as Regina Burks' prior inconsistencies with Detective Price, the impact of the proffered testimony upon the trier of fact would, at best, have been negligible. The State was able to prove statements by appellant himself that cast doubt on the veracity of the proffered testimony. The other evidence introduced by the State at trial, including the testimony of Guillem, contradicted the implication that Bishop McConnell was riding with appellant to the scene, much less that he could have committed the instant offense. The trial court's decision to bar the testimony of Regina Burks could not have interfered with the integrity of the trial process, or prejudiced the decision of the trier of fact. We find, beyond a reasonable doubt, that the exclusion of the proffered testimony did not contribute to the verdict of guilty or the penalty assessed by the jury. *Perez v. State,* 824 S.W.2d, at 568; and *Harris v. State,* 790 S.W.2d, at 587. Point of error twenty-two is overruled.

■ In his twenty-third point of error, appellant contends that the repeated injection of facts not in evidence during argument by the State was so inflammatory and prejudicial that an instruction to disregard them by the court was futile, and denied appellant to a fair trial, due process of law and equal protection of the law. Specifically, he contends that the prosecutor should not have used the terms "stocking mask" and "ski mask" during closing argument at guilt-innocence. Although appellant fails to identify the relevance of this distinction, the record reflects that an accomplice witness testified that appellant was seen with such an article of clothing immediately after the commission of the offense (See point of error fourteen, supra).

The record reflects that the following transpired during the State's closing argument at guilt-innocence:

THE STATE: "... His brother later saw (appellant) with a small caliber handgun and stocking mask, that he left the house with and put the stocking mask—

APPELLANT: Your honor, I object. I object, your Honor, those are not the facts and the evidence. There was no evidence

of any mask at all. There was evidence of a stocking cap, not a stocking mask.

THE COURT: Sustained.

APPELLANT: I ask the—

THE COURT: I instruct the jury they'll disregard the last statement of counsel for any purpose. They will recall the testimony as they heard it testified to from the witness stand.

APPELLANT: Move for a mistrial.

THE COURT: I overrule our motion. Go ahead.

THE STATE: Ladies and gentlemen, you heard Louis McConnell talk about how this man stuck a stocking cap, a black stocking cap or ski mask in—

APPELLANT: Your honor, I'm going to object again. There's no evidence of any ski mask in this case. The Counsel for the State is arguing outside the record on facts not in evidence.

THE COURT: I again sustain the objection and instruct the Jury they'll disregard the last statement of Counsel for the State and instruct the Jury that they'll recall the testimony as it was testified to by the witnesses from the witness stand.

APPELLANT: Move for a mistrial, Judge.

THE COURT: Overrule your Motion."

Appellant believes that the use of "stocking mask" and "ski mask" injected facts not in evidence. He further contends that the statements were manifestly improper and denied him a fair trial, due process, and equal protection of the laws to the degree that he is entitled to a new trial.

During the guilt-innocence portion of the trial, the State presented Louis McConnell, appellant's half-brother, as a witness. McConnell testified that he had seen appellant approximately one week before the instant offense took place. Upon returning home from work, McConnell discovered appellant at McConnell's residence. A gun and a dark navy blue or black hat were on a

dining room table. He initially referred to the hat as a "stocking cap" and "winterized type hat." Later, while still being questioned by the State, he referred to it as a "toboggan" hat added that he did not know whether it had eye holes. During cross examination, appellant read a statement that McConnell had given to police on or about February 17, 1989. In the statement, the McConnell referred to the hat as a ski mask and said that the item had holes for the eyes. The witness alleged that he had not included such details regarding the hat in the statement and they had been added without his knowledge. He asserted that he only knew that the article was a stocking cap.

Upon redirect examination, McConnell was questioned concerning a recorded question and answer session conducted by the State at the McLennan County District Attorney's Office on February 23, 1989. In an attempt to impeach the witness, McConnell was asked if he remembered giving two answers during this session where he directly stated that he saw eye holes in a ski mask. Finally, McConnell stated during recross examination by appellant that he did not see holes in the mask he saw on the table.

■ Where argument is improper because it is outside the record, the error may be cured by a jury instruction to disregard the evidence. *Hammond v. State,* 799 S.W.2d 741 (Tex.Cr.App.1990) (citations omitted); *Pyles v. State,* 755 S.W.2d 98, at 118 (Tex.Cr.App.1988); *Drakes v. State,* 505 S.W.2d 892 (Tex.Cr.App.1974). However, if such argument is manifestly improper or so extreme that an instruction will not work to cure the error, reversal will be mandated. *Kunkle v. State,* 771 S.W.2d 435 (Tex.Cr.App. 1986), cert. denied, 492 U.S. 925, 109 S.Ct. 3259, 106 L.Ed.2d 604 (1989), rehearing denied, 492 U.S. 937, 110 S.Ct. 21, 106 L.Ed.2d 634 (1989); *Brandley v. State,* 691 S.W.2d 699 (Tex.Cr.App.1985).

While McConnell stated at trial that he did not know whether there were eye holes in the hat, his prior statement indicated that there were. This conflicting testimony left

the issue of whether the item was a ski cap or ski mask unresolved. Therefore, without finding whether a ski mask was or was not in evidence, we find that the jury instruction sufficiently cured any possible error. See *Hammond* and *Pyles,* supra. Because of the conflicting testimony, we cannot find that the State's closing argument was manifestly improper or extreme. *Kunkle,* supra; cf. *Gomez v. State,* 704 S.W.2d 770 (Tex.Cr.App. 1985) (prosecutor's statement that defense attorney manufactured evidence could not be removed from jury's consideration by instruction). Point of error twenty-three is therefore overruled.

Appellant asserts in point of error twenty-four that the trial court erred in allowing evidence of a prior alleged capital murder, including horrendous photographs, alleged to have been committed by appellant, when such charges against him were dismissed because of insufficient evidence.

■ We begin by noting that appellant's argument in his brief does not comport with his objection at trial. At trial, appellant argued to the court that the State should not have been allowed to introduce any extraneous offenses unless they could prove them beyond a reasonable doubt. Finding that this was not a requirement of 37.071, the trial court denied appellant's request. Appellant now argues that proof of an extraneous, unadjudicated capital murder should not have been admitted since the charges against him were dropped.

■ An objection stating one legal basis may not be used to support a different legal theory on appeal. *Rezac v. State,* 782 S.W.2d 869, 870 (Tex.Cr.App.1990). We find that appellant did not make the same objection at trial that he makes in his brief. Consequently, we find that no error is preserved. However, in the interests of justice we will address his argument.

■ Appellant complains of testimony that was given concerning an extraneous offense that involved a capital murder that took place during the burglary of a Texaco in August of 1982. The witnesses who testified concerning this offense included Gary Bridgewater, appellant's cousin and a fellow inmate of appellant's while he was incarcerated at the McLennan County Jail in August of 1982. Bridgewater asserted that appellant told him that during that month he had broken into a service station in Waco and in the process of doing so discovered someone asleep in the station. According to Bridgewater, appellant stated that he hit the person he found with a tire iron and then stole some tires.

Mike Nicoletti, an officer with the Waco Police Department, testified that he was involved in the burglary and murder case in August of 1982 at a Texaco station on IH–35 in Waco. Nicoletti testified that he took photographs of the crime scene. He explained that several crime scene photographs, which were introduced, revealed that the victim had been brutally cut and beaten. Nicoletti believed the victim "received severe blows to the head", such that the victim's head was swollen. On cross-examination, appellant asked Nicoletti if the charges were dropped because of insufficient evidence. Nicoletti answered that he believed that was the cause.

Mike Trantham, a Waco Police Department detective, also testified about his involvement in the investigation of the August, 1982 service station robbery and murder. He stated that he signed an affidavit in support of an arrest warrant for appellant. According to Trantham, appellant was arrested. While in custody, he told an assistant district attorney that he had nothing to do with the crime. Trantham further stated that the case against appellant was "retired" and appellant was never indicted or prosecuted for the offense. While Trantham also implied that there was additional information pointing to appellant that was obtained from other inmates, the court sustained appellant's objection during the line of questioning which would have revealed its nature. Although Trantham also mentioned that during the investigation he had received information

that someone else had committed the crime, he commented there was never enough information to arrest the other suspects. This information included hearsay from a Gary Hawes who allegedly had heard from a James Shaw that Shaw had admitted to breaking into a gas station in August of 1982 and in the process of doing so stabbed a man. Trantham also explained that all other suspects, except appellant, had been eliminated from consideration. Trantham testified on direct examination that appellant was still the number one suspect in the case.

Finally, appellant admitted the testimony of Pat Murphy by deposition. Murphy was an assistant district attorney in McLennan County at the time of the offense and was involved in attempting to formulate a case against appellant. He stated that he had to "retire" [27] the case against appellant. Most importantly, knowing that Bridgewater's statement was the primary evidence against appellant for this extraneous offense, Murphy stated that Bridgewater's reputation for truthfulness and veracity was bad.

■ Article 37.071, V.A.C.C.P. authorizes the trial court to admit any evidence which is relevant to a defendant's deathworthiness and the jury is authorized to consider this evidence along with that adduced at the guilt-innocence stage of trial. *Allridge v. State,* 762 S.W.2d 146, at 161 (Tex.Cr.App. 1988). Additionally, the trial court has wide discretion in admitting or excluding evidence. *Id.,* at 162. It is necessary, however, that evidence of any extraneous transactions is shown to be relevant and that the accused actually participated in the extraneous offense. *Id.,* at 161; *Harris v. State,* 827 S.W.2d 949, 961 (Tex.Cr.App.1992); *Beltran v. State,* 728 S.W.2d 382, 387 (Tex.Cr.App. 1987).

■ Before extraneous offenses may be introduced during the punishment phase of a capital murder trial, the State must "clearly prove" to the trial court that an offense was committed and that the accused was the perpetrator. *Kemp v. State,* 846 S.W.2d 289, at 307 (Tex.Cr.App.1992); *Turner v. State,* 754 S.W.2d 668, 673 (Tex.Cr. App.1988); *Elkins v. State,* 647 S.W.2d 663, 665 (Tex.Cr.App.1983). In applying the "clear proof" standard on appellate review, "we evaluate the trial court's ruling solely to determine whether it was in that zone of reasonable disagreement, in which '(r)easonable men may disagree whether in common experience a particular inference is available.'" *Kemp,* supra, quoting *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Cr.App. 1990). In doing so, we will not conduct a de novo review of the evidence so as to superimpose our own analysis of the evidence over an equally plausible interpretation of the trial court. *Id.* We keep in mind while performing this review that once evidence is deemed admissible, the jury is the ultimate judge of the credibility of witnesses and of the weight to be given their testimony. See *Bonham v. State,* 680 S.W.2d 815 (Tex.Cr.App.1984).

We find that the *Kemp* "clear proof" requirement was met in the instant case. We believe that although adverse testimony was given concerning Mr. Bridgewater's reputation for truthfulness and veracity, evidence was produced that appellant was involved in the offense. Bridgewater's statements were supported by Detective Trantham's testimony that appellant remained the primary suspect in the case. Since this evidence was relevant to special issue two, the trial court was obliged to allow the State to present the witnesses and vest the jury with the discretion whether or not to believe them. We find that, in the aggregate, the testimony of Bridgewater, Trantham and Murphy placed the issue of whether appellant committed the extraneous offense in the zone of reasonable disagreement among which reasonable persons may disagree. *Kemp,* supra. Therefore, we find that it was not error to allow the testimony concerning the extraneous of-

---

27. Murphy explained that when a case was "retired", it "simply means we did not proceed with the prosecution."

fense and we overrule point of error twenty-four.

By way of point of error twenty-five, appellant argues that the trial court erred in failing to give an instruction in the second main charge of the court concerning the consideration by the jury of mitigating circumstances, which would give the jury a clear and meaningful way to express their findings regarding any such mitigating circumstances, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Appellant does not detail the evidence he presented at punishment which he believes requires a mitigating instruction. Instead, he argues that the United States Supreme Court has found the Texas capital sentencing statute unconstitutional because it does not provide the sentencer with a manner in which to give effect to all mitigating evidence presented by a capital defendant. *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

■ TEX.R.APP.PRO. 74(f) requires, in part, that appellate briefs include a discussion of the facts and authorities relied upon in an argument. In the absence of a discussion of the evidence which appellant feels justifies a mitigating instruction, we find that he has failed to comply with Rule 74(f), supra. Standing alone, this is sufficient to justify overruling point of error twenty-five. We will, however, address his argument in the interests of justice.

■ Appellant presented six witnesses at punishment, four of whom gave details about his background which he apparently believed required a mitigating instruction. Two of these witnesses described how appellant had a poor educational background which was evidenced by his inability to read or write. His sister was in the group and testified that appellant "helped" her as a child. Another witness substantiated that he was a well behaved when he was younger. Finally, a jailer who was among the four testified that appellant did not cause any trouble between

the time he had been arrested for the instant offense and the time of his trial.

Evidence of limited intellectual and mental capability may be addressed within the special punishment questions and does not require an additional jury instruction. *Lackey v. State*, 819 S.W.2d 111 (Tex.Cr.App.1989); *Boyd v. State*, 811 S.W.2d 105 (Tex.Cr.App. 1991). Good behavior as a child is also evidence which has no significance independent of the second special issue. *Boyd*, supra. Moreover, evidence of past good deeds is cognizable within the scope of the special issues. *Ex parte Bower*, 823 S.W.2d 284 (Tex.Cr.App.1991). Finally, evidence of a good prison record can be given full effect through the second special issue. *Jones v. State*, 843 S.W.2d 487, at 497 (Tex.Cr.App. 1992).

Appellant does not present evidence of mental retardation or severe childhood abuse such as the defendant in *Penry*, supra. Instead, he offered evidence which has been found cognizable within the scope of the special issues that were given. See *Lackey, Boyd, Bower* and *Jones*, supra. We find that the jury was able to give full effect to appellant's mitigating evidence and the requirements of the Eighth and Fourteenth Amendments were satisfied. Point of error twenty-five is therefore overruled.

■ In points of error twenty-six and twenty-eight, appellant argues that the trial court erred in failing to define the terms "criminal acts of violence" and "continuing threat to society", respectively, in the charge of the court given during punishment. Appellant believes these terms have a peculiar meaning requiring them to be defined for the jury, and the lack of these definitions precluded the jury from considering and giving effect to mitigating evidence under the Eighth and Fourteenth amendments to the United States Constitution and Article one, sections nine and ten of the Texas Constitution.

This Court has repeatedly held that the terms "criminal acts of violence" and "con-

tinuing threat to society" require no special definitions. *Goss v. State*, 826 S.W.2d 162 (Tex.Cr.App.1992); *Earhart v. State*, 823 S.W.2d 607 (Tex.Cr.App.1991); *Lackey v. State*, 819 S.W.2d 111 (Tex.Cr.App.1989). They are simply to be applied in "their usual acceptation in common language." *Lackey*, supra, quoting *King v. State*, 553 S.W.2d 105, at 107 (Tex.Cr.App.1977). Because there was no need to provide these definitions, appellant's twenty-sixth and twenty-eighth points of error are overruled.

■ In his twenty-seventh point of error, appellant argues that the trial court erred in failing to give an instruction in the second main charge of the court regarding evidence of extraneous offenses, and the "manner" in which the jury was to consider such evidence. Specifically, he contends that there should have been some instruction which established the State's burden of proof when presenting the extraneous offenses. While appellant believes it should be the "beyond a reasonable doubt" standard, he states that any burden of proof instruction would have been sufficient.

The court's charge at punishment required that the State prove all punishment issues beyond a reasonable doubt. Appellant requested an additional charge that instructed the jury not to consider the extraneous offenses unless they were proven beyond a reasonable doubt. The instruction was denied.

Where the charge to the jury properly requires the State to prove each of the special punishment issues beyond a reasonable doubt, no burden of proof instruction concerning extraneous offenses is required. *Boyd v. State*, 811 S.W.2d 105, at 123–124 (Tex.Cr.App.1991); *Lewis v. State*, 815 S.W.2d 560, at 567 (Tex.Cr.App.1991).

Given that the charge in the instant case properly established the State's burden of proof with regard to the special punishment questions, we find no error. Point of error twenty-seven is therefore overruled.

The judgment of the trial court is affirmed.

MILLER, J., concurs in the disposition of point of error no. 1 and joins the rest of the opinion.

McCORMICK, P.J., not participating.

CLINTON, Judge, dissenting.

I join Judge Maloney's dissenting opinion in this cause. I write additionally to address the Court's treatment of appellant's seventeenth point of error, that the trial court erred to admit testimony from Ike Weeks that fully a month before the instant offense appellant solicited him to participate in an unspecified robbery. The majority holds that this evidence is admissible, Tex.R.Cr. Evid., Rule 404(b) notwithstanding, because it shows a "plan" to rob Jesse's Tortilla Factory, and because it is "same transaction contextual evidence." The majority parades these words as if their meanings, and application in the context of this case, were self-evident. One suspects that, forced to articulate how Weeks' testimony shows "plan" as that word is properly understood in context of Rule 404(b), or how exactly it can be construed to be part of the "same transaction" or "context" as the offense here, the majority would be, ironically, at a loss for words.

Under Rule 404(b), supra, evidence of "other crimes, wrongs, or acts" is not admissible simply "to show that [a person] acted in conformity therewith." To the extent it may be relevant to show "plan," not just propensity, evidence of other crimes, wrongs, or acts may be admissible. The existence of a plan may constitute an evidentiary fact from which an elemental fact, such as identity or intent, may be inferred. *Montgomery v. State*, 810 S.W.2d 372, at 387 (Tex.Cr.App. 1991) (Opinion on rehearing on Court's own motion). But as the late Judge W.C. Davis observed in his plurality opinion in *Boutwell v. State*, 719 S.W.2d 164, at 181 (Tex.Cr.App. 1986) (Opinion on State's motion for rehearing), before extraneous misconduct is relevant to show "plan," there must be evidence that both the extraneous misconduct and the charged offense "are steps toward the accom-

plishment of the plan." A robbery, real or inchoate, in late December, is not admissible in the prosecution of a robbery/murder in late January, at least under the guise of "plan," unless there is some basis in the evidence to believe that both robberies were part of an overarching "plan," such that it can be said that the planner committed both. Otherwise, proof of the earlier robbery serves no probative function but to show that the perpetrator is a robber in general, and therefore more likely committed the later robbery—an inference Rule 404(b) forbids. See *Boutwell v. State*, supra, at 180–81. There is absolutely no evidence of an overarching "plan" in this cause.

"Plan" aside, evidence that appellant solicited help *specifically* to rob Jesse's Tortilla Factory in late December would constitute some evidence that he took part in the robbery of that establishment in late January. It would thus be some evidence, however tenuous, of identity, and would not be *per se* inadmissible under Rule 404(b). It might not be highly probative evidence relative to its potential for prejudice; but it would be relevant apart from its character conformity value, and I do not understand Tex.R.Cr.Evid., Rule 403, to be at issue here. Indeed, this is the reason I agree with the majority that appellant's eighteenth point of error is meritless. Evidence that appellant was overheard the day before the offense engaged in conversation that could rationally be construed as planning the logistics of that offense certainly tends to make more likely his identity as one of the perpetrators. But appellant was *not* overheard in late December to solicit someone *specifically* to rob Jesse's Tortilla

Factory. That appellant solicited someone to commit an unspecified (or, as he now calls it, a "generic") robbery one month before does not tend to make more likely that he robbed Jesse's Tortilla Factory, except to the extent that one who commits robberies in general is more likely to have committed a particular robbery. The rulemakers have deemed the probativeness of that kind of evidence to be substantially outweighed by the danger of unfair prejudice, as a matter of law, under Rule 404(b). *Montgomery v. State*, supra, at 387.

Testimony that appellant solicited another to help him to commit an unspecified robbery a month earlier cannot rationally be considered "same transaction contextual evidence" either. It certainly cannot be said that the charged offense "makes little or no sense" absent this testimony. *Rogers v. State*, 853 S.W.2d 29, at 33 (Tex.Cr.App.1993). The testimony was not, therefore, "necessary." *Id.* That the Court has recently held extraneous misconduct admissible as "same transaction context evidence" despite its failing to meet the "necessity" test of *Rogers* is bad enough. *Lockhart v. State*, 847 S.W.2d 568, at 575–76 (Tex.Cr.App.1992) (Clinton, J., dissenting); *Camacho v. State*, 864 S.W.2d 524, at 537–38 (Tex.Cr.App.1993) (Clinton, J., dissenting). Here the solicitation of Weeks was not even remotely contemporaneous with the charged offense, and did not reference Jesse's Tortilla Factory at all. It cannot reasonably be said to have occurred during the "same transaction," or in "context" of, the charged offense, even understanding those words in their common acceptation.* Apart from its misbegotten conclusion that

---

* The Court cites *Mann v. State*, 718 S.W.2d 741 (Tex.Cr.App.1986), for the proposition that "same transaction context" evidence is admissible because "events do not occur in a vacuum." *Mann* was tried before the advent of the new rules, so it is inapplicable to the extent it may conflict with, e.g., *Rogers v. State*, supra. In any event, it is simply fatuous to maintain that a solicitation to commit an unspecified robbery in late December fills any "vacuum" left in the wake of a specific robbery/murder actually committed in late January. Again the majority invokes words, but fails to justify their application to the instant cause. In *Mann*, the defendant and an accomplice burst into a home where two

men and a woman were watching television. The men were bound, and the woman was taken to a bedroom, where she was raped and killed. The two men were then taken out to a secluded area, shot, and left for dead. Mann was prosecuted for capital murder of one of the men. On appeal he contended that the trial court erred to allow proof of the rape and murder of the woman. This Court held this evidence admissible because it was "necessary to a full picture and understanding of what took place." 718 S.W.2d at 744. The killings were, if not contemporaneous, at least part of an uninterrupted chain of events. Here the evidence establishes no link at

appellant's solicitation of Weeks was all part of one "plan," the majority does not attempt to explain how it was part of the "same transaction or context." It seems that these words, "plan" and "same transaction context evidence," have become even more of a talisman for the admission of objectionable evidence than that old incantation, "res gestae," ever was!

To the continued substitution of empty words for clear thinking and cogent analysis, I dissent.

MALONEY, Judge, dissenting.

I respectfully dissent to the majority's disposition of appellant's twenty-second point of error. In his twenty-second point of error, appellant contends the trial court erred by excluding Regina Burks' testimony that Bishop McConnell III admitted killing the deceased. Outside the jury's presence, Regina testified that three or four hours after the offense, she overheard Bishop repeatedly state to two men whom she did not know that Bishop had shot Jesse Contreras. She further testified that Bishop was very intoxicated and "[n]obody ever pays attention to him when he's drunk." The trial court sustained the State's objection that Regina's testimony was hearsay which did not meet the requirements of the statement against penal interest exception to the hearsay rule.

Statements against penal interest are admissible under rule 803(24) of the Texas Rules of Criminal Evidence only if "corroborating circumstances clearly indicate the trustworthiness of the statement." Tex. R.Crim.Evid. 803(24). With respect to the determination of a statement against penal interest's trustworthiness, we recently wrote:

> Any number of factors may be considered in this inquiry, including whether the guilt of the declarant is inconsistent with the guilt of the accused, whether the declarant was so situated that he might have committed the crime, the timing of the declara-

tion and its spontaneity, the relationship between the declarant and the party to whom the declaration was made, and the existence of independent corroborating facts. Further, evidence which undermines the reliability of the statement as well as evidence corroborating its trustworthiness may be considered, so long as the court is careful not to engage in a weighing of the credibility of the in-court witness.

*Davis v. State,* 872 S.W.2d 743, 749 (Tex. Crim.App.1994). Considering these factors, Regina's testimony was admissible, as the majority correctly holds, albeit for slightly different reasons. Maj. Op. at 904–905.

Having determined that Regina's testimony was admissible, the question is whether the error of exclusion contributed to appellant's conviction or punishment. *Harris v. State,* 790 S.W.2d 568, 585–88 (Tex.Crim.App. 1989); Tex.R.App.P. 81(b)(2). In *Harris,* this Court recognized that harmfulness of error is not determined by the existence of overwhelming evidence, although it can be a factor:

> [I]n making the [harmless error] analysis the predominant concern must be the error. If the court rules that an error is harmless it is in essence asserting that the nature of the error is such that it could not have affected the jury, so the jury must have relied on overwhelming evidence of guilt in the first place. If overwhelming evidence dissipates the error's effect upon the jury's function in determining the facts so that it did not contribute to the verdict then the error is harmless. Otherwise, it is not.

*Id.* at 587. As the majority correctly writes, "[t]he question, then, is 'whether a rational trier of fact might have reached a different result if the error and its effects had not resulted.'" Maj. Op. at 905–906 (quoting *Harris,* 790 S.W.2d at 588).

all between appellant's solicitation of Weeks in late December and the robbery of Jesse's Tortilla

Factory in late January. *Mann* is no authority for the Court's holding today.

The record reflects that one hour before the offense and a few blocks away from the crime scene, Bishop was in the same car Victor Macias saw at the crime scene. Macias never identified appellant as the man he saw running from the crime scene. The Waco Police did not obtain fingerprints from the crime scene. Arguably, Bishop could have been the person Macias saw running from the crime scene. Bishop owned a gun similar, if not identical, to the murder weapon. A gun was not recovered from appellant and the accomplice-witness (whose capital murder charges were dismissed for his testimony) testified that he never saw appellant with a gun on the day of the offense. And, despite the threats to his aunt, appellant did not admit committing the offense to her or anyone else.

Regina's testimony was not inconsistent with the State's evidence against appellant. Given the weakness of the State's evidence, Regina's testimony that shortly after this offense occurred, Bishop repeatedly admitted to committing it, if believed, could have created in the jury's minds a reasonable doubt as to whether appellant shot Contreras. Therefore, I cannot conclude *beyond a reasonable doubt* that the trial court's error in excluding Regina's testimony did not contribute to appellant's conviction or subsequent death sentence. TEX.R.APP.P. 81(b)(2). I would reverse the judgment of the trial court and remand this cause to that court for a new trial. Because the majority does not, I respectfully dissent.

BAIRD, J., joins.