

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-18-00489-CR

———————————————————

RODNEY ALLEN BROWN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 2
Tarrant County, Texas
Trial Court No. 1554428R

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant Rodney Allen Brown appeals his conviction for the continuous sexual abuse of a child under the age of fourteen and the resulting sentence of incarceration for life. In one issue, Brown argues that the trial court erred by "admitting into evidence a summary of the forensic interview of the complaining witness." Because we conclude that Brown has not preserved this issue for our review, and alternatively, that Brown was not harmed by the complained-of evidence, we affirm.

### II. BACKGROUND

Brown met the complainant (Complainant) in this case through his stepdaughter (Darla).[1] Complainant and Darla were best friends, and Complainant would often go over to Darla and Brown's house. Brown began hugging Complainant in a manner that Complainant described as "weird." Brown's conduct toward the Complainant progressed, and he began to pick her up without anyone else around, take her to get food, buy her things, and talk with her on the phone or through an instant messaging application. According to Complainant, Brown progressed to cuddling her, kissing her, and ultimately making her have sexual intercourse with him on multiple occasions over several years at various locations.

---

[1]We are using pseudonyms to protect the identity of the minor complainant in this case. *See* Tex. Const. art. I, § 30(a)(1); Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

Eventually, Complainant told her sister (Sister) about some of these incidents, and Sister then called and reported the abuse to police. Later, police arrested Brown for the continuous sexual abuse of Complainant. A jury trial was held.

## A. Complainant's Testimony

Complainant, who was sixteen at the time of trial, testified that when she was in the second grade, she met Brown through Darla. According to Complainant, she and Darla lived in the same neighborhood, and she would stay at Darla's house "[e]very weekend" when school was in session and "the whole summer and whole spring break." Complainant recalled that the first time Brown had ever touched her was when he gave her a hug right after he had hugged Darla and right before he left for work. Complainant said that she was in second grade at the time. According to Complainant, Brown's hug made her feel "weird" because "[i]t was just like a hug that you would give to your boyfriend or girlfriend, and it was like a weird vibe."

By Complainant's account, Brown hugged her in a similar fashion once more, but "then the next time I remember him hugging me or cuddling me was when he was laying down in bed and I was laying on his chest." Complainant recalled that Brown did not have his shirt on at the time and that Brown is the one who suggested she get in the bed with him. Complainant said that Darla's grandmother came into the room and saw them and that after the grandmother left, Brown told her to leave the room because the grandmother was "probably going to be thinking something's going on between" Complainant and Brown. Complainant was in the fourth grade at the time.

3

One early morning, when Complainant and Darla were sleeping in the top bunk of Darla's bunk bed, Brown came into the room after Brown had just gotten home from work. Because Complainant and Darla would sleep opposite of each other in the bed, Complainant's head was close to the door, and Darla's head was near the wall, furthest from the door. Complainant said that Brown shook her awake, assured her it was him, and "then he just started kissing" her. Allegedly, Brown held Complainant's face in his hands as he kissed her, and he put his tongue in her mouth purposely touching it against her tongue.

Complainant said that on another occasion, she, Darla, Brown, and Darla's mother (Carla) were lying in bed together, but Carla got up and left the house to purchase donuts. After Carla left, according to Complainant, Brown began to kiss both her and Darla on their lips. When it was apparent that Carla was returning, Brown stopped.

By Complainant's account, she and her family moved away from the neighborhood when she was in the sixth grade, and she and Darla no longer saw each other. Around that same time, Complainant's biological father moved away from the family because of allegations that the father had sexually abused Complainant's two oldest sisters. During the ensuing investigation, Complainant made an outcry that her half brother had made her touch "his private part, and he would touch" hers. Neither of them had clothes on at the time, and Complainant's half brother was "in his twenties." Complainant said that after the incidents involving her father and half

4

brother occurred, she again started to hang out with Darla, and Brown was always buying her "stuff" when she came around.

Complainant testified that she could not remember when it happened but that after the first time Brown inserted his penis into her vagina, she later saw blood in her underwear. Complainant said that she "just started crying," and she threw the bloody underwear into the laundry hamper. She also averred that at one point, when Brown was living in his own apartment by himself, she would message him,[2] and he would come and get her and take her for food. She would sometimes even go to his apartment with him when it was just the two of them. According to Complainant, Brown made her have sex at his apartment at least once.

Complainant recalled another occasion when Brown came to pick her up and she brought along a friend. But Brown got angry and told her that when he would come pick her up, he expected it to be just the two of them.

Brown also used to pick Complainant up after volleyball practice. In addition to buying her food and picking her up after practices, Brown would also buy Complainant "clothes and stuff." Complainant said that usually if she would ask Brown for anything, he would buy it for her, including once buying her a clarinet.

_____

[2]According to Complainant, she and Brown would communicate through a messaging application called "Kik," and a feature of Kik is that it deletes the messages between the individuals once they log off the application. Complainant said that she used her mother's phone when communicating with Brown.

Complainant also recalled another incident of abuse when Brown had moved back in with Darla and Carla, and everyone was preparing to go to bed and Brown stopped her in the hall:

> [Carla] was asleep, everybody was asleep, and me, [Darla] and [Brown] was in the living room watching TV. And I was falling asleep on the couch, so he was, like, go to bed. So we was going to bed, but [Darla] made it to the room before me. Then [Brown] was behind me and he stopped me, and he was, like, I miss you so much, and he put me against the wall and just took my clothes off and pulled his pants down and started having sex with me.

Complainant testified that she was twelve years old at the time.

Complainant also said that when other people were around, Brown would normally instruct her to be quiet when he was assaulting her. She said he would sometimes put his hand over her mouth to keep her from making any audible noises. And Complainant testified to other times when Brown assaulted her when others were around.

By Complainant's account, she once messaged Brown to come pick her up to get some food. Brown picked her up, but instead of going for food, he took her to a carwash, parked near one of the vacuums, put a sun visor over the window, turned on the vacuum and placed it in the car with the door barely opened, and had intercourse with her in the backseat. Complainant said that they did not get food and that Sister was waiting for her when Brown drove her home and inquired why they had taken so long.

6

Complainant described for the jury how on one occasion when it was just her, Darla, Darla's brother, and Brown in the house, Brown called her and Darla "one by one" into his bedroom. According to Complainant, she went into Brown's room and then she and Brown went into the bathroom, he sat her on the counter, and then "he just pull[ed] his pants down and [her] pants down and [they] had sex." Complainant said that she was eleven years old at the time. After Brown had finished, Complainant went back into the living room, and Brown called Darla to come to his room. Complainant said that she could not remember all the times that Brown had made her have sex with him: "A lot. I can't keep track of how many times."

During cross-examination, Complainant described how she was once in the kitchen talking with Sister, and Sister asked her whether anyone had tried to "touch" her. Complainant replied that Brown had "touched [her] and has had sex with [her] before." Specifically, Complainant told Sister "[a]bout the time when [she and Brown] had sex at the car wash, when [she] was at his house, and when [she] was in the room with him when he used to live in Arlington with [Darla] and her grandma." She also told Sister about an occasion when Complainant and Darla were in the living room with Brown, and he was kissing both of them.

Defense counsel questioned Complainant about the forensic interview she participated in after her outcry against Brown. Defense counsel asked if she had only told the forensic interviewer about three events between her and Brown, and Complainant said that she had told the interviewer that Brown had forced her to have

7

sex with him "multiple times." When asked whether she had told the interviewer about "three specific times," Complainant replied, "Yes, three times that I remembered." Defense counsel inquired whether the first encounter she discussed with the interviewer was the time when Brown made her have sex with him in the bathroom, and Complainant said, "Yes, when he was taking turns with me and [Darla]." Complainant again described how on that occasion Brown had made her have sex with him as she sat on the bathroom counter. Defense counsel next pressed Complainant for details regarding her earlier testimony and the bathroom incident Complainant had just testified about for the jury. Through his questions, defense counsel alleged that Complainant had described different and additional details of the bathroom incident in her testimony than she had in the forensic interview. Complainant replied to this line of questioning by stating, "[T]here was multiple times when we had sex in the restroom. . . . I didn't tell [the interviewer] everything."

Under continued cross-examination, Complainant again told how Brown had made her have sex with him in his apartment when they were alone. She explained how Brown had once stopped her in the hallway after everyone had retreated to bed and forced her to have sex with him against a wall. She also testified, as she had on direct examination, how Brown had made her have sex with him in the bedroom when Brown's friends and family were in the house, and Brown had ejaculated on the floor. Defense counsel asked whether she had told the interviewer that specific instance, and Complainant stated, "I didn't tell a lot of instances."

8

Defense counsel also asked what Complainant had told the interviewer about the time that Brown had kissed her when Darla was also in the bed. After defense counsel again alleged that what Complainant had testified to about the kissing incident was different than what she had told the interviewer, Complainant replied, "No, it was the same story." Defense counsel further pushed Complainant about what she had told the interviewer regarding Brown having used his tongue while kissing her and whether she had told the interviewer that Brown had not used his tongue. Complainant responded, "I said yes, there was tongue." Defense counsel also asked whether Complainant had left out a lot of details when describing the carwash incident to the interviewer, and Complainant acknowledged, "Yes."

On redirect examination, Complainant said again that she had not told the interviewer about every sexual encounter she had with Brown and that she had not told the interviewer every detail about the incidents she did report during the interview. Complainant also testified about a time when Brown had messaged her and asked to pick her up from volleyball practice the next day, and she said, "No," and how Brown came to practice the next day anyway and slapped her in the face and told her, "Don't ever tell me no." Supposedly, Brown also used to make her rub his feet, legs, and upper thighs.

On re-cross-examination, defense counsel asked her if there was any incident that she could remember that she had not told the jury, and Complainant said, "Yes" and then went on to describe an event where she had come out of the shower, Darla

9

was then showering, and Brown made her have sex with him. According to Complainant, she also remembered a time when Brown made her have sex with him, asked her where she wanted him to ejaculate, she said into a towel, and so he did. Complainant averred that it was during her initial testimony that she first revealed that Brown would have sex with her almost every time they were together. Defense counsel asked if she had ever told the interviewer that she was a virgin prior to the incident where Brown had called her and Darla into the bedroom one at a time, and Complainant said that "she never asked me was I a virgin when [Brown first began to have] sex with me."

## B. The Forensic Interviewer's Testimony

The State then called the forensic interviewer, Carrie Paschall, to testify. After asking Paschall about her qualifications and the nature of forensic interviews, the prosecutor began to ask Paschall about her forensic interview with Complainant. Specifically, the prosecutor asked Paschall, "And what did she tell you?" Immediately, the following exchange occurred:

[Defense Counsel]: Objection, hearsay, Your Honor.

[Prosecutor]: Judge, under optional completeness --

THE COURT: Yes.

[Prosecutor]: -- he's already gone into the forensic interview.

THE COURT: Yeah, that's true. It's overruled.

10

Notably, defense counsel neither made another hearsay objection nor requested a running objection during Paschall's testimony.[3] As the prosecutor's examination continued, Paschall recalled how Complainant had initially said that Brown had "molested her." When asked whether Complainant had gone into any detail about what Brown may have done to Complainant, Paschall said, "Yes." Paschall then went on to explain how Complainant had told her about a time that Brown came into Darla's room early in the morning after returning from work while she and Darla slept in the top bunk bed, woke Complainant up, and kissed Complainant, including placing his tongue in her mouth. Paschall said that Complainant also relayed that Brown had kissed Darla as well but that Complainant did not know "what type of kiss it was."

Paschall recalled another incident Complainant told her about where Brown had her lay on his chest but nothing else occurred because someone had come home, and Brown told her to leave the bedroom. Additionally, Paschall said that Complainant told her about a time when Carla was at work

> and that [Brown] called [Complainant] into the bathroom and had sex with her in the bathroom and then sent her out of the room and asked for [Darla]. And then [Darla] was in there a short time, and then [Complainant] was told to go back in there, where he had sex with her again.

---

[3]During Paschall's testimony, defense counsel did object at one point that "she's just reading from her notes. I mean, obviously, if she wants to use it to refresh her memory, we don't have an issue with that."

11

Paschall further stated that Complainant had told her that there were "a lot of times" when Brown had made Complainant have sex with him. And Paschall said Complainant remembered Brown having made her have sex with him when others were home. Specifically, Brown called her into the bedroom, made her have sex with him, and then he ejaculated. Paschall said that Complainant also told about a different time when Brown asked Complainant where she wanted him to ejaculate after he made her have sex with him, and she told him into a towel, so he did.

By Paschall's account, Complainant described the carwash event in details that were consistent with Complainant's testimony. Complainant also told Paschall about the time she refused Brown's ride, but he came to Complainant's practice anyway and slapped her in the face for having told him no. And Complainant told Paschall about Brown making her have sex with him in his apartment where he was living alone at the time.

When the prosecutor asked whether Complainant had told Paschall how many times Brown had made her have sex with him, Paschall said that Complainant "indicated that it was definitely more than five times, maybe as many as ten. She did not provide an exact number." According to Paschall, Complainant told her that Brown had instructed her not to say anything to anyone about what had been going on or that he would go to jail.

## C. Other Evidence

The State called other witnesses in addition to Complainant and Paschall, including Sister and Complainant's mother, who generally testified to some of the things Complainant had told them about Brown's abuse and about Brown's behavior toward Complainant leading up to her outcry. Complainant's mother also testified that Brown had once asked that Complainant be allowed to live with him, Carla, and Darla and that Brown would treat Complainant like his own daughter by buying her things, assisting her with rides from volleyball practice, and generally including her in activities with himself, Carla, and Darla.

Other witnesses included the investigating officer, Darla, and Carla, who testified that after the accusations against Brown having sexually assaulted Complainant came out, Brown's response was to "jab" a knife in his throat. Carla also said that she had her "suspicions" that Brown had been inappropriate toward Complainant prior to the accusations. Brown testified in his own defense and denied having ever sexually abused Complainant.

## D. The Verdict and Sentence

A jury found Brown guilty of the continuous sexual abuse of a child, and after the punishment phase of trial, the jury assessed punishment at life in prison. The trial court rendered judgment accordingly, and this appeal followed.

## III. DISCUSSION

In his sole issue, Brown argues that the "trial court err[ed] by admitting into evidence a summary of the forensic interview of the complaining witness."[4] Specifically, Brown argues that the trial court should not have allowed Paschall to testify as to what Complainant told her during the forensic interview. We conclude that Brown has failed to preserve this issue for our review, and alternatively, that Brown was not harmed by Paschall's testimony.[5]

---

[4]Brown has not told this court which statements Paschall made that he believed to be inadmissible. He has complained only that allowing Paschall to "summarize" what Complainant told her during the interview was impermissible hearsay. In his reply brief to this court, Brown concedes that there were three areas that he believes Paschall was entitled to testify about: (1) what Complainant said about an incident in the bathroom, (2) what Complainant said about the kissing incident, and (3) the frequency of the sexual contact between Brown and Complainant.

[5]Because we have concluded that Brown has failed to preserve his issue for our review and that, even assuming the trial court erred by admitting Paschall's testimony, Brown was not harmed by its admission, we need not address both parties' arguments regarding whether the trial court appropriately admitted Paschall's testimony under the rule of optional completeness. *See Tovar v. State*, 221 S.W.3d 185, 187–88, 190–92 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that defendant's cross-examination of minor victim about part of contents of her videotaped statement to social worker left false impression with jury regarding contents of statement, and thus remainder of videotaped statement was admissible under rule of optional completeness); *Smith v. State*, Nos. 01-10-00903-CR, 01-10-00904-CR, 2012 WL 1067946, at *2 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, pet. ref'd) (mem. op. on reh'g, not designated for publication) (holding that trial court did not abuse its discretion by allowing forensic interviewer to testify about what complainant had said during interview under rule of optional completeness after defense had cross-examined complainant about parts of her forensic interview).

## A. No Preservation of Hearsay Objection

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016). Further, the party must obtain an express or implicit adverse trial court ruling or object to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Everitt v. State*, 407 S.W.3d 259, 262–63 (Tex. Crim. App. 2013); *Martinez v. State*, 17 S.W.3d 677, 686 (Tex. Crim. App. 2000). Because it is a systemic requirement, this court should independently review error preservation, and we have a duty to ensure that a claim is properly preserved in the trial court before we address its merits. *Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016); *Wilson v. State*, 311 S.W.3d 452, 473 (Tex. Crim. App. 2010). Generally, a party must object each time the objectionable evidence is offered. *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Clay v. State*, 361 S.W.3d 762, 766 (Tex. App.—Fort Worth 2012, no pet.).

Here, Brown objected only once to the forensic interviewer's general testimony, and his "hearsay" objection was never repeated. Brown did make another objection during Paschall's testimony, but it was not a hearsay objection. Thus, Brown has failed to preserve his hearsay objection to Paschall's testimony because he failed to object each time she testified to what Complainant had told her, and he did not either obtain a running objection or lodge an objection to the complained-of testimony outside the

15

presence of the jury. *See Haley v. State*, 173 S.W.3d 510, 517 (Tex. Crim. App. 2005); *Ethington v. State*, 819 S.W.2d 854, 858–59 (Tex. Crim. App. 1991).

## B.  No Harm from Paschall's Testimony

But even if Brown had preserved this issue for our review, we conclude that he was not harmed by the admission of Paschall's testimony.  Improper admission of evidence is not reversible error if the same or similar evidence is admitted without objection at another point in the trial.  *Chamberlain v. State*, 998 S.W.2d 230, 235 (Tex. Crim. App. 1999); *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991); *see Lamerand v. State*, 540 S.W.3d 252, 256–57 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) ("The erroneous admission of hearsay does not constitute reversible error 'if other evidence proving the same fact is properly admitted elsewhere.'").  In other words, when the erroneous admission of evidence is cumulative of other properly admitted evidence proving the same fact, the erroneous admission is considered harmless.  *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999); *see also Burks v. State*, 876 S.W.2d 877, 898 (Tex. Crim. App. 1994) (holding that police officer's erroneously admitted hearsay testimony did not harm defendant when testimony of other trial witnesses proved same facts).

This well-established harm analysis includes when evidence of what was said in a forensic interview is erroneously introduced and yet the complainant has testified to the same facts described in the interview.  *Stephens v. State*, Nos. 02-15-00046-CR, 02-15-00047-CR, 2016 WL 2586639, at *4 (Tex. App.—Fort Worth May 5, 2016, pet. ref'd)

16

(mem. op., not designated for publication). This is true whether the duplicative evidence was testimony compared to the video of the interview or whether it was testimony compared to another witness's testimony. *Matz v. State*, 21 S.W.3d 911, 912–13 (Tex. App.—Fort Worth 2000, pet. ref'd) ("Because the videotape is cumulative of T.M.'s properly admitted testimony on the same issue, even if the trial court erred in admitting the videotape, we must disregard the error because it could not have affected Appellant's substantial rights."); *see also Burks*, 876 S.W.2d at 898 ("Because the testimony at trial of Macias and Diaz proved the same facts that the State sought to admit through the testimony of Price, we conclude that Price's erroneously admitted hearsay testimony did not harm appellant.").

Here, as can be seen through a side-by-side comparison of their testimony, Complainant's testimony about what Brown had done to her and Paschall's testimony about what Complainant had told her during the interview that Brown had done are duplicative of each other:

| Complainant's Testimony | Paschall's Testimony |
| --- | --- |
| "It was just in the morning when I woke up, and I don't -- I don't know, I just -- I don't really remember how I got in there. I just remember me laying down on his chest . . . and he had no shirt on and it was dark." | "[S]he says he called her into the room, that he had no shirt on and was laying in the bed and told her to lay down, and that he put his arms around her and just held her . . . ." |
| "I was, like, when I first woke up, I was scared. And then he was, like, it's me, it's me, and I was just, like, oh. And then he just started kissing me. . . . Oh, he was kissing me, like he grabbed my head. He | "Yes. So she indicated that he woke her up by shaking her and said it's me, and then he kissed her on the lips, told her to tongue kiss him and put his tongue in her mouth. And then she indicates that a |

17

| | |
|---|---|
| grabbed my head and was just . . . [kissing me while using his tongue]." | short time later, he did the same thing again." |
| "One time he picked me up from volleyball practice, and the night before we were texting on Kik and he asked me to call him, and I said no. So the day that he came to pick me up the next day, he slapped me in my mouth when I got in the car and said, Don't ever tell me no." | "And she talked about how he had been messaging her on Kik, which is an instant messaging, like a text message app, and that he -- he had asked her to do something, and she said why in the text exchange. And when he had picked her up that day, he expressed to her that he was unhappy with her response and slapped her in the face." |
| "He parked -- like, you know like when you go to a car wash and you have to do it yourself and they have, like, the sections? . . . . Yes, ma'am, to, like, block the sun out. And he put [a sunshade] in front, and he has tinted windows. So he has, like, the vacuum inside the car, like, the door's kind of shut and the vacuum's in the car, and we in the back seat and was having sex." | "She said that he had told her he would come pick her up and take her to get food, and that he drove around with her in the car, ended up parking at a car wash and told her to get in the back seat, and put a sun shade up in the front windshield and asked her to get in the back seat. And then she was laying down in the back seat and he was on top of her and had sex with her." |
| "And we in the bathroom, and like I'm sitting on, like, you know, like, the counter against the mirror and everything, and he just pulls his pants down and pull my pants down and we have sex." | "[H]e called her into the bathroom and had sex with her in the bathroom and then sent her out of the room . . . ." |
| "Right now the only one I can think about that we haven't talked about was when he asked me if he wanted -- where I wanted him to come. . . . That's the one he come on the towel." | "So she says that, in her words, that cum came out of there and that he asked her do you want it on your -- inside of you, on your stomach, or in a towel, and she said in a towel and he grabbed a towel." |
| "[We had sex a] lot. I can't keep track of how many times." | "She indicated that [the number of times Complainant and Brown had sex] was definitely more than five times, maybe as many as ten. She did not provide an exact number." |

Paschall's testimony was nothing more than an accumulation of Complainant's testimony about the same acts and incidents where Brown made Complainant have sex with him. Thus, we must consider the admission of Paschall's testimony as harmless, even if assumed to be improperly admitted hearsay, because Complainant's same or similar testimony was admitted without objection at an earlier point in trial. *See Brooks*, 990 S.W.2d at 287. We overrule Brown's sole issue.

## IV. CONCLUSION

Having overruled Brown's sole issue on appeal, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: December 3, 2020